appropriately inform and advise the President on the intelligence activities of the IC elements. Disclosure of the withheld portions of the assessments could impede the goals of Executive Order 13462, including early identification and correction of compliance weaknesses and proactive oversight of the IC's intelligence activities, and could hinder ODNI support to the IOB and ultimately the President.

### Emails and Inter-agency/Intra-agency Documents[8]

31. Most of the ODNI's day-to-day work on Executive Order 13462 matters is done through emails or meetings, as these methods best facilitate the inter-agency and intra-agency discussions required to prepare the intelligence oversight assessments and ODNI quarterly reports. Generally, there are three categories of emails at issue: 1) internal ODNI communications, 2) communications between the ODNI and other IC elements or between the ODNI, the IOB, and other IC elements, and 3) communications solely between the ODNI and the IOB.

32. Internal ODNI staff's communications related to IOB matters cover a broad range of topics, from preparing for upcoming meetings to discussing and assessing reports submitted by the heads of IC elements. This broad range of topics is due

---

[8] Documents 22, 30-31, 77, 107, 115-117, **118**, 119-121, **123**, 130, 173-175, 179-201, 204-207, 209-211, **213-214,** 215, 217, 224-225, 227, 229-230, 232, 235, 237-238, 241, 244, **245**, 246, **250**, 251-254, 256, 259, 262, 264-267, 269-272, 275, 277-283, 286, **287**, 288-289, **290**, 291-292, **295**, 296-297, **299-300**, 303, **303-304**, 305, **306,** 307, 311-317, 319-320, 322, **323**, 324-326, **327**, 328-330, **334, 338,** 339-341, 343, **344-346,** 347-351, **352**, 353, **354, 356, 363-364, 365,** 366-367, **369,** 371, **372, 374,** and 378-379 as referenced in the Vaughn Index. Documents numbers in bold reflect documents that fall into more than one category.

in part to the ODNI's unique role in serving as an IC oversight body and as an IC reporting body.

33. As an IC oversight body, the ODNI IOB Team must have the ability to openly discuss its internal reviews and assessments of the IC's performance prior to discussions with the relevant IC element or the IOB. Publicly disclosing the ODNI IOB team's internal discussions would have the effect of chilling the internal ODNI dialogue related to the reports submitted by the heads of IC elements, which would seriously impair the evaluation process. Moreover, internal ODNI IOB team discussions over the IC's performance need to occur without concern that preliminary or informal opinions or comments concerning an IC element's performance will be disclosed to the IC element itself. For example, some email discussions between ODNI IOB team members provided criticisms of an agency's report or reporting performance while another email assessed that an agency's report needed updating and additional information.[9] Some emails requested input from other team members on whether the intelligence oversight assessment should contain specific references to certain matters and how to categorize the reporting performance of certain elements.[10]

---

[9] Vaughn Index documents 193, 196 and 204.
[10] Vaughn Index documents 194, 201 and 209.

34. Similarly, in order for the ODNI IOB team to fulfill its role as a reporting body to the IOB, the ODNI IOB Team must remain free to internally discuss potentially reportable matters before deciding whether an incident requires an official report to the IOB.[11] For example, the ODNI IOB team inquired as to the accuracy of a reported incident and debated whether one incident involved ODNI equities and if so, whether the ODNI had authority over the specific matter.[12] Another email asked other ODNI IOB team members for input on whether there was ODNI involvement in a particular matter and if so, the extent of any ODNI involvement.[13] In some instances, the matter was referred to another agency or the debate was resolved. And in other instances, the ODNI IOB team decided that the incidents were potentially reportable incidents to the IOB. ODNI IOB team members must be free to go through this give and take process in order to fully review and assess whether a certain matter is reportable to the IOB. Revelations of internal ODNI discussions on these potentially reportable matters would chill deliberations to the detriment of the reporting process and important oversight activity.

35. The second category of emails and related documents consist of communications between the ODNI and other IC

---

[11] Vaughn Index document 181.
[12] Vaughn Index document 180.
[13] Vaughn Index document 197.

elements. The communications included discussions of the initial stages of an investigative matter or updates on ongoing reviews or investigations that may need to be elevated to the attention of senior officials or included in the ODNI intelligence oversight report.[14] The ODNI IOB team maintains and updates spreadsheets and forms that track an incident reported by an IC element, an IC's reporting performance, and any remediation efforts.[15] Because the ability to collect and analyze this type of information for the intelligence oversight reports depends on the thorough and responsive submissions by the IC elements, the agencies must feel comfortable in reporting on sensitive matters, especially if the agency is unsure as to whether the matter is reportable. And an agency must know that its information, even if shared with the ODNI or the IOB, will not be disclosed to other agencies, let alone the public. If the ODNI is unable to maintain the confidentiality of these agencies' matters, it may lead to underreporting of incidents or insufficiently detailed reports, potentially impairing the ODNI's ability to accurately assess the true nature and status of the agency's investigation into or handling of a matter. The lack of full and accurate input into the ODNI also has

---

[14] Vaughn Index documents 206 and 279.
[15] Vaughn Index documents 107 and 130.

repercussions with respect to the quality of IOB recommendations to the President.

36. The final category of emails consist of communications between the ODNI and the IOB. These emails primarily examine and comment on the timeliness and quality of an agency's reporting as well as an agency's responsiveness in reporting matters. These emails contain candid opinions on the performance of certain agencies and provide ideas and feedback on what should be done to improve reporting responsibilities. For example, in an email to ODNI IOB team members, an individual expressed candid opinions concerning a particular agency's performance and provided suggestions on how that particular agency's reporting performance could be improved.[16] In other email exchanges, an individual inquired as to whether a particular matter was considered a newly reportable activity or whether the particular matter had been previously reported and whether a matter should be categorized as significant or highly sensitive matter.[17]

37. Other inter-agency emails and documents exchanged between the ODNI IOB Team and the IOB concern: agendas or issues that should be discussed in greater detail at meetings; ideas on how to streamline reporting procedures; specific discussions of

---

[16] Vaughn Index document 183, 192, 311 and 316.
[17] Vaughn Index documents 205 and 283.

reported matters; and strategies for outreach to and discussions about specific IC elements. The discussions in these emails and documents are meant to garner opinions, generate debate and formulate strategies on how to best effectuate their obligations under Executive Order 13462.

38. Protecting these discussions from disclosure enables the ODNI to efficiently interact with the IOB, to explore all possible actions, and to debate issues without the concern that any deliberations could be revealed to the public or to other IC elements. Honest feedback and analysis are necessary components of evaluating the IC's performance and substantive exchanges between the ODNI and the IOB must be protected from disclosure even from other IC elements. The disclosure of discussions meant to stay within ODNI and IOB channels could harm ODNI's working relations with reporting agencies. A thorough intelligence oversight assessment depends on candid discussions free from the scrutiny of the affected agencies and the public.

39. Furthermore, Sections 4 and 6 of Executive Order 13462 afford the PIAB and the IOB some discretion of when to provide recommendations to the DNI and the heads of the department. Section 4 of Executive Order 13462 permits the PIAB to consider and make appropriate recommendations to the President, the DNI, or the head of the department concerned as the PIAB determines appropriate or when directed by the President. Section 6(d) of

Executive Order 13462 provides that the IOB report as necessary on its review of the effectiveness, efficiency, and sufficiency of the processes by which the DNI and heads of departments concerned perform their respective functions, together with any recommendations, to the President and, as appropriate, to the DNI and the heads of the department concerned. Revealing the IOB's substantive opinions and recommendations contained in these emails or documents would in essence strip the PIAB and the IOB of their discretion of when and who to advise on which particular matters.

### Draft Material[18]

40.  Draft documents are documents provided to the ODNI for coordination, input, edits, or suggestions before they become final. Draft material can be redacted or withheld pursuant to FOIA Exemption 5 to protect against the premature disclosure of proposed policies or positions before they are actually adopted. This permits a free exchange of ideas and language choices that can help agencies craft a more accurate and complete report, official statement or effective policy.

41.  The ODNI redacted or withheld predecisional or draft material to protect from disclosure the ODNI's inputs, language choices, comments, track changes, edits, and questions to

---

[18] Documents 84, **105-106**, 108-110, **118**, **128-129**, **131**, 162-164, 169, 172, 201-203, 208, **213-214**, **245**, **250**, 263, 284-285, **287**, **290**, 294,**295**, 298,**299**, **301**, **303**, **306**, 310, 318, 321, **327**, 331-333, **334-346**, **352**, **354**, 355, **356**, 357, 360-362, **365**, 368, **369**, **372**, **374**, and 377 as referenced in the Vaughn Index. Documents numbers in bold reflect documents that fall into more than one category.

21

proposed policies, final reports or official statements. Often, the predecisional or draft material contained "informal" or "draft" markings in the documents to indicate that the material was not final or not officially ratified by the agency. Or at times the predecisional or draft material would be attached to emails, indicating that the documents were in draft status.

42. The ODNI IOB Team often circulated drafts among each other for coordination purposes and to ensure other team members were aware of the latest developments. In this case, drafts frequently circulated between ODNI IOB Team members for team review and comment prior to finalization were the intelligence oversight assessments and the ODNI quarterly reports.

43. Drafts from other agencies were sent to the ODNI to elicit comments and input for proposed policies, reports or statements. In these situations, agencies requesting review and comment had the discretion to decide whether to incorporate or reject the ODNI's comments into the final policy, report or official statement. For example, the Department of Defense provided a draft DoD Directive Type Memorandum ("DTM") meant to implement the IOB's reporting criteria. The ODNI IOB Team coordinated comments between team members on the proposed policy. Extensive comments were exchanged between team members before the ODNI provided one consolidated recommendation to DoD. This type of collaborative review is often done to blend the

views of many ODNI IOB team members into one cohesive viewpoint for procedural efficiency.[19]

44. In other situations, the IOB and ODNI IOB team would share drafts of emails, agendas or letters for comment prior to sharing them with IC elements.[20] Team members also provided input into a draft intelligence oversight frequently asked questions document. After multiple exchanges between the IOB counsel and the ODNI, the final version was provided to IC agencies and posted to the ODNI OGC website, accessible to the IC. The ODNI also provided a copy of the final version to plaintiff but continued to withhold in full emails relating to the draft versions of these documents as the emails contained comments and input provided by ODNI IOB team members in the coordination process.[21]

45. Revealing predecisional or draft material that has not undergone the rigors of an interagency coordination process could cause confusion by revealing premature policies and positions that may conflict with the final version. It also undermines the interagency coordination process by deterring agencies from sharing proposed policies, reports, or statements with others and deprives agencies of the opportunity to fully

---

[19] Vaughn Index documents 162 and 163.
[20] Vaughn Index documents 108 and 202.
[21] Vaughn Index documents 294, 298 and 354.

debate the merits or feasibility of a proposed policy matter or position.

<u>Internal Briefings, Talking Points, and Internal Memorandums</u>[22]

46.   FOIA Exemption 5 also protects internal deliberative documents to encourage open, frank discussions on matters of policy between subordinates and superiors. Internal briefing powerpoint slides, talking points, and internal memorandums are predecisional and deliberative documents protected under FOIA Exemption 5 when drafted and prepared for the purpose of advising a senior official for an official action or meeting.

47.   The ODNI located internal powerpoint briefing slides created for senior ODNI officials. One powerpoint deck for a senior ODNI official was created to highlight the challenges in the ODNI's intelligence oversight reporting responsibilities, to inform him of current and proposed internal personnel staffing and resource allocations, and to provide recommendations on how to improve the process. Another deck of internal briefing slides was created for the new ODNI General Counsel in order to brief him on his responsibilities in reporting matters to the IOB and to identify issues he may encounter as the ODNI General Counsel.

---

[22] Documents 104, **105-106, 123, 128-129, 131,** 158-159, 177, 255, 260, **301, 304** and **323** as referenced in the Vaughn Index. Documents numbers in bold reflect documents that fall into more than one category.

48. ODNI talking points were drafted to prepare senior ODNI officials for IOB meetings where senior officials would be expected to raise concerns, discuss policy issues, and provide recommendations on behalf of the ODNI. The internal talking points were created for the purpose of preparing the senior ODNI official for matters that he or she may need to discuss. Although some of the talking points contain certain factual information about the IOB and actions taken by the ODNI, the individuals who wrote these talking points selected which facts were the most important and necessary to advise senior ODNI officials on IOB matters.

49. Internal cover memorandums or ODNI Staff Summary Forms ("SSF") were also withheld pursuant to Exemption 5 and the deliberative process privilege. These documents are internal forms used within the ODNI to properly and thoroughly staff actions for senior officials.[23] They are used when ODNI staff are seeking approval of a particular action, signature on a document, or for purely information purposes. The SSF provides any background information and analysis necessary to permit senior officals to determine what action they want to take and identify those officials that have reviewed and approved the underlying action.

---

[23] Vaughn Index documents 158 and 159.

50. In this case, two of these cover memorandums were located, both of which requested that a senior official sign an attached letter. One SSF requested that the DNI sign a joint memo with the IOB chair on reporting criteria and instructions for reporting agencies. The final, signed joint memo was released in full to the plaintiff in ODNI's February 25, 2010 release. The SSF provided background and rationale behind the request for the DNI's approval and provided a section that identifies which offices concurred with the recommendation and the points of contact within each of those offices should the DNI wish to discuss the contents of the SSF in greater detail with them. A second SSF was submitted to an ODNI senior official for his review and decision on whether to concur with a policy proposed by another agency. The SSF provided background information on the relevant draft policy and a recommendation regarding whether the senior official should concur or non-concur in the policy. In both instances the senior official ultimately signed the letter as requested.

51. These memorandums are intended to ensure that ODNI senior officials get the information they need to make informed decisions and to ensure that all relevant ODNI offices have reviewed the underlying action prior to it being submitted to senior officials. It is vital that ODNI employees are candid in their views and provide all necessary information. Because

these SSFs contain an ODNI officer's summary of the issues, thoughts, and suggestions, they often function as internal briefings for ODNI senior officials. If employees staffing packages throughout the ODNI have to be concerned about the public disclosure of these documents they might be more circumspect and less candid and frank in their recommendations to senior officials, which would be extremely detrimental to the internal decision making process of the ODNI.

## Conclusion

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 18 day of November, 2011.

_____
John F. Hackett
Office of the Director of National Intelligence
Chief, Information Management Group