UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,<br><br>Plaintiff,<br><br>vs.<br><br>CENTRAL INTELLIGENCE AGENCY, et al.,<br><br>Defendants. | Case No:  C 09-3351 SBA<br><br>**ORDER**<br><br>Docket 63, 76 |

Plaintiff Electronic Frontier Foundation ("Plaintiff") brings the instant action against various federal agencies under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the release of reports submitted to the Intelligence Oversight Board ("IOB") and/or the Office of the Director of National Intelligence ("ODNI")[1] concerning actual and suspected intelligence violations that occurred in the years following September 11, 2001. The parties are presently before the Court on cross-motions for summary judgment.  Dkt. 63, 76.  Defendants the Department of Homeland Security ("DHS"), the Department of Defense ("DOD"), the National Security Agency ("NSA"), the Department of Justice ("DOJ"), and the ODNI (collectively, "Defendants")[2] seek a determination that they have properly withheld information under § 552(b) of FOIA.  Defs.' Mtn. at 1-2, Dkt. 63.

---

[1] The Director of National Intelligence ("DNI") serves as the head of the United States intelligence community; acts as the principal adviser to the President, the National Security Council, and the Homeland Security Council for intelligence matters related to national security; and oversees and directs the implementation of the National Intelligence Program.  50 U.S.C. § 403(b).

[2] All of the other named Defendants have been dismissed.

1  Plaintiff's combined opposition and cross-motion for summary judgment seeks an order

2  denying Defendants' motion for summary judgment on the ground that Defendants have

3  failed to sustain their burden to demonstrate that the information they withheld is exempt

4  from disclosure under FOIA.  See Pl.'s Mtn. at 1.  Additionally, Plaintiff seeks an order

5  compelling the Defendants to release all information improperly withheld under FOIA.  Id.

6          Having read and considered the papers filed in connection with these matters and

7  being fully informed, the Court hereby GRANTS IN PART AND DENIES IN PART

8  Defendants' motion for summary judgment, and DENIES Plaintiff's cross-motion for

9  summary judgment, for the reasons stated below.  The Court, in its discretion, finds these

10  matters suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b); N.D. Cal.

11  Civ. L.R. 7-1(b).

12  **I.       <u>BACKGROUND</u>**

13          Plaintiff is a non-profit organization that works to inform policymakers and the

14  general public about civil liberties issues related to technology, and to act as a defender of

15  those liberties.  Compl. ¶ 5.  Plaintiff "strives to protect the rights of free expression,

16  freedom of the press, fair use, anonymity, security, and privacy as they relate to computing

17  and the Internet."  Id.  In furtherance of its mission, Plaintiff frequently uses the FOIA to

18  obtain and disseminate information concerning the activities of federal agencies.  Id.

19  Plaintiff filed the instant action to obtain reports sent by intelligence agencies to the ODNI

20  and/or the IOB, which is a five-member committee of the President's Intelligence Advisory

21  Board ("PIAB") whose members are designated by the President.  Id. ¶¶ 1, 14.

22          The PIAB was established within the Executive Office of the President[3] for the

23  exclusive purpose of advising and assisting the President on the activities of the intelligence

24  community.  See Exec. Order 13462; 50 U.S.C. § 401a(4) (defining "intelligence

25

26  ──────────────────

27          [3] Because Executive Order 13462 established the PIAB as an office within the
   Executive Office of the President, the PIAB and its committee, the IOB, are subject to
   FOIA.  See <u>Judicial Watch, Inc. v. Department of Justice</u>, 365 F.3d 1108, 1110 n. 1 (D.C.

28  Cir. 2004); 5 U.S.C. § 552(f)(1).

community").[4]  The PIAB's responsibilities include "assess[ing] the quality, quantity, and adequacy of intelligence collection, of analysis and estimates, and of counterintelligence and other intelligence activities, assess[ing] the adequacy of management, personnel and organization in the intelligence community, and review[ing] the performance of all agencies of the Federal Government that are engaged in the collection, evaluation, or production of intelligence or the execution of intelligence policy. . . ."  Exec. Order 13462 § 4.  The PIAB reports the results of such assessments or reviews to the President "as necessary but not less than twice each year," and to the DNI and the heads of the executive departments concerned when "the PIAB determines appropriate."  Id.  The PIAB also makes appropriate recommendations to the President, the DNI, or the head of the executive department concerned.  Id.

        The IOB is a committee of the PIAB.  See Exec. Order 13462 § 5(a).  It is required to "inform the President of intelligence activities that the IOB believes . . . may be unlawful or contrary to Executive Order or presidential directive; and . . . are not being adequately addressed by the Attorney General, the DNI, or the head of the department concerned; or . . . should be immediately reported to the President."  Id. § 6. Under Executive Order 13462, the IOB is required to "receive and review information submitted by the DNI . . . and make recommendations thereon, including for any needed corrective action, with respect to such information, and the intelligence activities to which the information relates, as necessary, but not less than twice each year, to the President, the DNI, and the head of the department concerned."  Exec. Order 13462 § 6.  The IOB must also "conduct, or request that the DNI or the head of the department concerned, as appropriate, carry out and report to the IOB the

---

[4] "Intelligence Community" is defined to include, among others, the ODNI, the Central Intelligence Agency ("CIA"), the NSA, the DIA, offices within the DOD for the collection of specialized national intelligence through reconnaissance programs, the intelligence elements of the Army, the Navy, the Air Force, the Marine Corps, the Coast Guard, the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration, the Department of Energy ("DOE"), the Bureau of Intelligence and Research of the Department of State, and the Office of Intelligence and Analysis of the DHS.  See 50 U.S.C. § 401a(4).

results of, investigations of intelligence activities that the IOB determines are necessary to enable the IOB to carry out its functions" under the order.  Id.

The DNI provides information and assistance to the PIAB and the IOB that is needed by these entities to perform their functions set forth in Executive Order 13462. Exec. Order 13462 §§ 7, 8.  Specifically, the DNI is required to analyze reports submitted by intelligence community agencies to the IOB concerning any intelligence activities within those agencies that may be unlawful or contrary to Executive order or presidential directive, and to provide the IOB, as necessary and no less than twice each year, an analysis of these reports, including an assessment of the gravity, frequency, trends, and patterns of occurrences of intelligence activities that may be unlawful or contrary to Executive Order or presidential directive.  See id. §§ 6, 7; Exec. Order 12333 § 1.7(d).  The DNI is also required to submit to the IOB, as necessary and no less than twice each year, a summary of corrective actions that have been taken by intelligence community agencies and any related recommendations, and to provide an assessment of the effectiveness of corrective action taken by the DNI or the head of the department concerned with respect to intelligence activities that may be unlawful or contrary to Executive Order or presidential directive. Exec. Order 13462 §§ 6, 7.  In addition, the DNI, as the head of an intelligence community agency, is required to submit quarterly reports to the IOB concerning any intelligence activities within the ODNI that may be unlawful or contrary to executive order or presidential directive.  See Exec. Order 12333 § 1.7(d).

On February 25, 2008, Plaintiff faxed FOIA request letters to the CIA, the DHS's components - the Office of the Inspector General ("OIG") and the Office of General Counsel ("OGC"), the DOD, the Defense Intelligence Agency ("DIA"), the NSA, the FBI, the ODNI, the DOE, and the Department of State.  Compl. ¶ 19.  The letters requested disclosure of all reports submitted by each agency to the IOB pursuant to § 2.4 of Executive Order 12863 from January 1, 2001 through February 25, 2008.  Id.  On June 19, 2009, Plaintiff faxed FOIA request letters to the agencies listed above as well as to the Office of the Attorney General ("OAG").  Id. ¶ 31.  The letters requested disclosure of records

created pursuant to the respective agency's role under Executive Order 13462.  Id.  On July 22, 2009, Plaintiff commenced the instant action under FOIA seeking the disclosure of withheld records.  See id. ¶ 1.

On March 18, 2011, the parties stipulated to the dismissal of the DOE, the Department of State, and the OAG with prejudice.  Dkt. 54.  On May 13, 2011, the parties stipulated that Plaintiff will not challenge exemptions asserted by Defendants pursuant to § 552(b)(2) to the extent that Defendants have asserted "low 2 exemptions," and that Plaintiff will not challenge exemptions asserted by Defendants pursuant to § 552(b)(6), or exemptions asserted by Defendants pursuant to § 552(b)(7)(C) where such exemptions have been claimed in conjunction with § 552(b)(6).[5]  Dkt. 57.  The parties have also stipulated that a sample of documents will govern the Court's review of the exemptions claimed by the DOD, the FBI and the DIA, and that all Defendants will provide *Vaughn* indices in support of their withholding of records.[6]  Dkt. 57.  On July 29, 2011, the parties stipulated to the dismissal of the CIA with prejudice.  Dkt. 58.

The parties have also stipulated as follows: (1) the Defendants have conducted adequate searches for records responsive to the Plaintiff's FOIA requests; (2) the DOD has properly withheld material pursuant to Exemptions 3, 6 and 7(C); (3) the DHS has properly withheld material pursuant to Exemptions 6 and 7(C); (4) the ODNI has properly withheld material pursuant to Exemptions 2, 3, and 6; (5) the ODNI has properly withheld material pursuant to Exemption 1 where such withholdings are claimed coextensively with Exemption 3; and (6) Plaintiff does not dispute ODNI's withholding of material pursuant to Exemption 5 with respect to the following documents: 111-114, 125, 132, 134 -157, 160-161, 165-168, and 170-171.  Dkt. 62.

///

---

[5] There are nine statutory exemptions under FOIA.  See 5 U.S.C. § 552(b)(1)-(9).

[6] *Vaughn* indices are "descriptions of withheld documents and justifications for their withholding" so named for the case where they were first required.  Bay Area Lawyers Alliance for Nuclear Arms Control v. Dep't of State, 818 F.Supp. 291, 1294 (N.D. Cal. 1992); see Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

## II.    LEGAL STANDARD

"FOIA 'was enacted to facilitate public access to Government documents.' " Lahr v. National Transp. Safety Bd., 569 F.3d 964, 973 (9th Cir. 2009).  Congress intended FOIA to "permit access to official information long shielded unnecessarily from public view." Milner v. Dep't of Navy, 131 S.Ct. 1259, 1262 (2011).  FOIA requires federal agencies to make records available to the public, unless they fall within one of the nine exemptions enumerated in the statute.  Id.; see 5 U.S.C. § 552(b)(1)-(9) (setting forth the nine exemptions).  "The purpose of FOIA is to 'ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.' " Shannahan v. IRS, 672 F.3d 1142, 1148 (9th Cir. 2012); see Yonemoto v. Department of Veterans Affairs, 686 F.3d 681, 687 (9th Cir. 2012) (the "core purpose" of the FOIA is to inform citizens about "what their government is up to").

Where a citizen has made a request for information under FOIA, and the agency has refused in whole or in part to produce responsive materials, the act authorizes the citizen to bring suit in federal court challenging the agency's refusal to disclose documents to the requester.  See 5 U.S.C. § 552(a)(4)(B).  Because disclosure, not secrecy, is the dominant objective of FOIA, courts narrowly construe FOIA's nine statutory exemptions from disclosure.  Maricopa Audubon Soc'y v. United States Forest Serv., 108 F.3d 1082, 1085 (9th Cir. 1997); see Milner, 131 S.Ct. at 1262 (FOIA's nine statutory "exemptions are explicitly made exclusive, and must be narrowly construed").  "When an agency chooses to invoke an exemption to shield information from disclosure, it bears the burden of proving the applicability of the exemption." Yonemoto, 686 F.3d at 688.  Records that an agency withholds for reasons not within the exemptions "are improperly withheld." U.S. Dept. of Justice v. Tax Analysts, 492 U.S. 136, 151 (1989).

"As a general rule, all FOIA determinations should be resolved on summary judgment." Lawyers' Comm. for Civil Rights of San Francisco Bay Area v. U.S. Dept. of the Treasury, 534 F.Supp.2d 1126, 1131 (N.D. Cal. 2008) (citing Nat'l Wildlife Fed'n v.

U.S. Forest Service, 861 F.2d 1114 (9th Cir. 1988)).  "Unlike the typical summary judgment analysis, in a FOIA case, [courts] do not ask whether there is a genuine issue of material fact, because the facts are rarely in dispute."  Minier v. CIA, 88 F.3d 796, 800 (9th Cir. 1996).  Ultimately, the threshold issue on a motion for summary judgment is whether the agency's explanations are full and sufficiently specific to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding.  See Wiener v. FBI, 943 F.2d 972, 977, 979 (9th Cir. 1991) (noting that specificity is the defining requirement of the *Vaughn* index) (citing King v. U.S. Dep't of Justice, 830 F.2d 210, 218 (D.C. Cir. 1987)).

"To carry their summary judgment burden, agencies are typically required to submit an index and 'detailed public affidavits' that, together, 'identify[ ] the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption.' "  Yonemoto, 686 F.3d at 688.  These submissions - commonly referred to as a *Vaughn* index[7] - "must be from affiants who are knowledgeable about the information sought and detailed enough to allow the court to make an independent assessment of the government's claim of exemption."  Id. (internal quotation marks omitted).  Whether by *Vaughn* index or by affidavit or some combination of the two, the government must "provide enough information, presented with sufficient detail, clarity, and verification, so that the requester can fairly determine what has not been produced and why, and the court can decide whether the exemptions claimed justify the nondisclosure."  Fiduccia v. U.S. Dept. of Justice, 185 F.3d 1035, 1043 (9th Cir. 1999).  "To justify withholding, the government must provide tailored reasons in response to a FOIA request.

---

[7] The ordinary rules of discovery, in which each party has access to the evidence upon which the court will rely in resolving the dispute between them, do not apply in a FOIA case.  Weiner, 943 F.2d at 977.  Instead, only the party opposing disclosure has access to all the facts.  Id.  In recognition of this problem, courts have required government agencies seeking to withhold information under a claim of exemption to supply the opposing party and the court with a *Vaughn* index.  Id.

It may not respond with boilerplate or conclusory statements." <u>Shannahan</u>, 672 F.3d at 1148.

Courts "accord substantial weight to an agency's declarations regarding the application of a FOIA exemption." <u>Shannahan</u>, 672 F.3d at 1148. However, before giving the agency's expert opinion on national security matters the substantial weight to which it is entitled, a district court must ensure that it has an adequate foundation to review the agency's withholding claims. <u>King</u>, 830 F.2d at 225-226. Deference is not equivalent to acquiescence; an agency's declaration may justify summary judgment only if it is sufficient "to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." <u>Campbell v. U.S. Dept. of Justice</u>, 164 F.3d 20, 30 (D.C. Cir. 1998).

"Among the reasons that a declaration might be insufficient are lack of detail and specificity, bad faith, and failure to account for contrary record evidence." <u>Campbell</u>, 164 F.3d at 30. " '[A]n affidavit that contains merely a 'categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate.' " <u>Id.</u> "The affidavits must show, with reasonable specificity, why the documents fall within the exemption." <u>Id.</u> An affidavit will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping. <u>Id.</u> "These requirements are consistent with the agency's general obligation to create 'as full a public record as possible, concerning the nature of the documents and the justification for nondisclosure.' " <u>Id.</u>

## III.    <u>DISCUSSION</u>

Defendants contend that they are entitled to summary judgment on Plaintiff's FOIA claim because their *Vaughn* submissions[8] demonstrate that they have properly withheld information under § 552(b). <u>See</u> Defs.' Mtn. at 1-2. Plaintiff disagrees, arguing that

---

[8] Each Defendant has provided both a *Vaughn* index and a declaration to justify their withholding of information under FOIA. The Court will collectively refer to an agency's submissions as their *Vaughn* submissions.

Defendants have "failed to meet their burden on summary judgment both procedurally and substantively."  Pl.'s Mtn. at 1.  Specifically, Plaintiff argues that Defendants' motion for summary judgment should be denied because the *Vaughn* submissions are insufficiently specific, and because Defendants have failed to demonstrate that they have released all reasonably segregable material.  Id. at 4-9, 23-25.  Additionally, Plaintiff argues that summary judgment should be granted in its favor because Defendants have improperly withheld records under Exemptions 1, 5, and 7.  See id. at 9-23.[9]

Having reviewed the voluminous materials submitted in connection with the parties' cross-motions for summary judgment, the Court finds that, except as noted below, the *Vaughn* submissions provided by the Defendants are not sufficiently specific to allow the Court to determine whether the withheld information falls within the claimed FOIA exemptions justifying nondisclosure.  The Court also finds that no Defendant has performed an adequate segregability analysis.  In light of these deficiencies, the Court concludes that, other than the exception discussed below,[10] Defendants have failed to sustain their burden to demonstrate that the withheld information is exempt from disclosure under the claimed exemptions.  Therefore, the Defendants must either release the withheld information they failed to show is exempt from disclosure under FOIA or revise their respective *Vaughn* submissions by the deadline set forth below.

In the event that any Defendant decides to revise its *Vaughn* submissions, the Defendant should bear in mind that the purpose of the submissions is not merely to inform

---

[9] Defendants contend that the FBI and the DHS have properly withheld information under Exemption 3.  See Defs.' Mtn. at 8-10.  Plaintiff, however, has failed to respond to this argument.  As such, it is unclear whether Plaintiff agrees with Defendants that the FBI and the DHS have properly withheld information under Exemption 3.  Given Plaintiff's silence, the Court will not reach this issue.  The Court finds that it is not an efficient use of judicial resources to address this issue at this juncture, particularly since there might not be a dispute requiring the Court's resolution with respect to some or all of the withheld information.  To the extent a dispute exists, the Court finds that the interests of judicial economy are served by providing Plaintiff an opportunity to present argument regarding the FBI's and DHS's withholding of information under Exemption 3.

[10] As set forth below, the Court finds that the ODNI has properly withheld information from six documents under the presidential communication privilege and the deliberative process privilege.

the Plaintiff of the agency's conclusion that a particular document or portion thereof is exempt from disclosure under one or more of the statutory exemptions, but to afford the Plaintiff an opportunity to intelligently advocate for the release of the withheld information and to afford the Court an opportunity to intelligently review the soundness of the withholding.  Wiener, 943 F.2d at 979.  Below, the Court will discuss specific examples of Defendants' deficient *Vaughn* submissions.

### A.  Exemption 1

Plaintiff contends that the DOD, the DOD's component - The Office of Inspector General of the United States Army ("DAIG"), and the FBI's "Exemption 1 claims fail for lack of specificity."  Pl.'s Mtn. at 5.  Exemption 1 allows agencies to withhold information "specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and . . . in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).

Executive Order 13526 allows information to be classified as national security information if:

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 13526 § 1.1(a).

Collectively, the DOD, the DAIG, and the FBI invoke sections 1.4(c) and 1.4(d) of Executive Order 13526 to justify their withholding of information under Exemption 1. These sections permit classification relating to: "(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology"; and "(d) foreign relations or foreign activities of the United States, including confidential sources."  Exec. Order 13526

§ 1.4(c), (d).  Executive Order 13526 further provides that "[i]n no case shall information be classified . . . in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security."  Id. § 1.7(a).  If an agency sufficiently establishes that information satisfies the four criteria in Section 1.1(a) of the Executive Order, the agency need not disclose such information in response to a FOIA request.  King, 830 F.2d at 214 ("An agency may invoke [Exemption 1] only if it complies with classification procedures established by the relevant executive order and withholds only such material as conforms to the order's substantive criteria for classification.").

### 1.     The DOD

The DOD's *Vaughn* submissions include a spreadsheet index that describes twenty-six documents, each of which has been partially redacted pursuant to Exemption 1.  See Dkt. 63-16.  The spreadsheet identifies each document by its type (i.e., memo or report), title, and classification.  Id. at 1.  It also provides a brief justification for the withholding of information, including the statutory exemption(s) claimed, and states that each document is partially withheld.[11]  Id.  In addition to its *Vaughn* index, the DOD has submitted a declaration from Caryn Hargrave ("Hargrave"), Associate Deputy General Counsel in the Office of General Counsel of the DOD.  Hargrave Decl. ¶ 1, Dkt. 63-15.

Hargrave cites Executive Order 13526 as the basis for the DOD's withholding of information under Exemption 1.  Hargrave Decl. ¶ 4.  She avers that the information withheld by the DOD pertains to information relating to "intelligence sources and methods" as well as "certain information [that] would impair U.S. government relations with foreign governments."  Id. ¶¶ 6, 9.  According to Hargrave, the disclosure of information the government obtains through intelligence sources or methods could reasonably be expected to cause harm to national security by enabling "persons and groups hostile to the United

---

[11] The Court notes that the DOD does not indicate whether Document 1233-1237 is partially withheld or withheld in its entirety.  Dkt. 63-16 at 6.

1  States to identify U.S. intelligence activities, methods or sources, and to design

2  countermeasures to them, which would damage the U.S. government's ability to acquire

3  information that is often critical to the formulation of U.S. foreign policy and the conduct

4  of foreign relations." Id. ¶ 8.  Hargrave further avers that the release of the information

5  identified in the DOD's *Vaughn* [index] as being withheld under . . . §1.4(d) would damage

6  foreign relations" because it "consists of the types of information the intelligence

7  community is interested in collecting on foreign countries." Id. ¶ 9.

8      The Court finds that the DOD's *Vaughn* submissions are inadequate.  The DOD has

9  failed to provide a particularized explanation of how disclosure of the withheld information

10  in each document would damage the claimed interest protected by nondisclosure.  Wiener,

11  943 F.2d at 977.  The DOD's *Vaughn* index consists of boilerplate language, which is

12  identical or nearly identical for every document described.  An example illustrates the

13  insufficiency of the DOD's *Vaughn* index.  With respect to the document titled "ASD

14  Intelligence Oversight Summary (Jan-March 2001)," the index states as follows:

15          This document is withheld in part on the basis of Exemption (b)(1).
           Information pertaining to intelligence activities, intelligence sources, and
16          collection methods were redacted pursuant to Exemption (b)(1) to protect
           from disclosure national security information regarding national defense.  In
17          particular, the withheld material pertains to electronic intelligence collection
           methods and methods for collecting human intelligence.  The disclosure of
18          this information reasonably could be expected to cause serious damage to the
           national security.  The withheld portions of this document are properly
19          classified pursuant to section 1.4(c) of Executive Order 13526.

20  Dkt. 63-16 at 1.

21      The DOD's description of this document lacks sufficient detail and specificity to

22  allow the Court to decide whether the redacted information is properly classified under

23  Executive Order 13526.  In explaining the DOD's reasons for invoking Exemption 1,

24  Hargrave only offers a general description of the withheld information coupled with a

25  generalized indication of possible consequences of disclosing the information.  Such a

26  showing is insufficient to satisfy the reasonable specificity standard.  See Wiener, 943 F.2d

27  at 979; Campbell, 164 F.3d at 30-31.  Hargrave's declaration fails to provide a

28  particularized explanation justifying the DOD's withholding of information under

Exemption 1 on a document by document basis.  See Yonemoto, 686 F.3d at 688 (agency has the burden to provide particularized explanation for why each document falls within the claimed exemption).  Indeed, Hargrave's declaration does not discuss any particular document, let alone provide a reasonably detailed description of the contents of the documents and a relatively detailed justification as to why the redacted information falls within Exemption 1.  See King, 830 F.2d at 219 ("when an agency seeks to withhold information, it must provide 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply' ").  Without a sufficiently fact-specific declaration or *Vaughn* index, Plaintiff does not have a meaningful opportunity to challenge, and the Court does not have an adequate foundation to review, the soundness of the DOD's decision to withhold information under Exemption 1.

### 2.    The DAIG

The DAIG's *Vaughn* submissions describe eleven documents which are all partially redacted pursuant to Exemption 1.  See Dkt. 63-2.  Each of the redacted documents is a "Quarterly Intelligence Oversight Activities Report."  Id.  The DAIG's *Vaughn* index identifies the date of the document, the type of the document, who the document is from, who the document was sent to, the subject of the document, the number of pages of the document, and the exemptions claimed.  Id.  The index also provides a description of each document and a brief justification as to why the document was partially released under the exemptions claimed.  Id.  In support of its claimed exemptions, the DAIG offers the declaration of Margaret Baines, Deputy Legal Counsel for the Office of the Inspector General of the United States Army.  Baines Decl. ¶ 1, Dkt. 63-1.

In her declaration, Baines describes the quarterly reports as "compilations summarizing those questionable intelligence activities that come to the [DAIG's] attention as part of the [DAIG's] intelligence oversight responsibilities."  Baines Decl. ¶ 3.  Baines avers that she used Exemption 1 to "protect from disclosure classified information pertaining to significant questionable activities received during the respective quarter.

1   Specifically, [she] withheld references to intelligence activities, intelligence sources, and

2   collection methods, pursuant to this exemption to protect from disclosure national security

3   information regarding national defense."  Id. ¶ 4.

4          Baines further avers that the information is properly classified pursuant to Executive

5   Order 13526 § 1.4 because the information concerns "intelligence activities (including

6   covert action), intelligence sources and methods."  Baines Decl. ¶ 7.  She describes the

7   information withheld pursuant to Exemption 1 as "classified procedures and methods of

8   intelligence-gathering utilized by the Army to gather intelligence information."  Id.

9   According to Baines, "[t]he classification redactions have been asserted to protect from

10  disclosure information that would reveal the actual intelligence activities utilized by the

11  Army against specific targets of foreign counterintelligence investigations or operations; or

12  disclosure of intelligence gathering capabilities of the activities directed at specific targets.

13  The intelligence activities detailed in the withheld information are effective means for the

14  Army to gather, store, or disseminate intelligence information."  Id. ¶ 7.

15         Baines states that the information in the quarterly intelligence reports "concerning

16  intelligence activities is very specific in nature and known to very few individuals," and

17  that "[d]isclosure of the specific information which describes these intelligence activities

18  would reveal that they are still used by the Army today to gather intelligence information,

19  and could reasonably be expected to cause serious damage to the national security for the

20  following reasons: (1) disclosure would allow hostile entities to discover the current

21  intelligence activities used; and (2) disclosure would reveal or determine the criteria used--

22  and priorities assigned to-- current intelligence or counterintelligence investigations.

23  Hostile entities could then develop countermeasures which could severely disrupt the

24  Army's intelligence-gathering capabilities.  This would severely damage the Army's efforts

25  to support the military mission with useful and timely intelligence."  Baines Decl. ¶ 8.

26         The Court finds that the DAIG has failed to satisfy its burden to prove that the

27  claimed exemption from disclosure applies.  The DAIG's explanation for nondisclosure

28  lacks sufficient detail and specificity demonstrating that information was properly withheld

under Exemption 1.  The DAIG's *Vaughn* index contains boilerplate language, which is nearly identical for each of the eleven redacted documents.  An example is representative of the insufficiency of the DAIG's *Vaughn* index.  The DAIG describes the "Quarterly Intelligence Oversight Activities Report (Fourth Quarter, FY 06)" as follows: "This is a 17-page document from the Army Inspector General, Intelligence Oversight to the Assistant to The Secretary of Defense (Intelligence Oversight ) submitting the Quarterly Intelligence Oversight Activities Report for Fourth Quarter, FY 06.  This document is classified Secret." Dkt. 63-2 at 2.

The DAIG justifies the redaction of information from this document under Exemption 1 as follows:

> Exemption (b)(1) – This exemption was used to protect from disclosure classified information pertaining to significant questionable activities received during the Fourth Quarter of FY 06. Specifically, intelligence activities, intelligence sources, and collection methods, that are properly classified, were redacted pursuant to this Exemption (b)(1) to protect from disclosure national security information regarding national defense.  The information redacted pursuant to Exemption (b)(1) discusses human intelligence sources, methods for collecting human intelligence, and the details of a clandestine foreign operation.  Exempted information is properly classified pursuant to Executive Order 13526 Sec. 1.4(c), DOD Directive 5340.1-R, Army Regulation 381-10, and DOD Directive 5200.27.

Id.

The DAIG has failed to describe the contents of this document with sufficient detail and clarity.  Further, the DAIG has failed to provide a particularized explanation justifying the withholding of information from this document under Exemption 1.  See Yonemoto, 686 F.3d at 688.  The DAIG's *Vaughn* index provides a general description of this document and a boilerplate explanation for why information was withheld under Exemption 1.  The supporting Baines declaration does not specifically discuss this document, let alone provide a relatively detailed justification identifying the specific reasons why the redacted information falls within Exemption 1.  See King, 830 F.2d at 219. No effort is made by the DAIG to tailor the explanation for the redaction of information from the specific documents at issue.  See id. at 224 ("Vaughn's call for specificity imposes on the agency the burden of demonstrating applicability of the exemptions invoked *as to*

*each document or segment withheld*.") (emphasis in original); see Campbell. 164 F.3d at 30-31 (finding declaration inadequate because it did not contain any "language suggesting that the FBI tailored its response to a specific set of documents.").  These deficiencies are present in each of the eleven partially redacted documents.  The DAIG's generalized document descriptions coupled with boilerplate explanations for exemption do not provide a sufficient foundation for Plaintiff to contest, and the Court to assess, whether the exemption claimed justifies nondisclosure.

### 3.    The FBI

The FBI's *Vaughn* index describes more than 170 documents.  Dkt. 63-14, Exh. I.  Of these documents, over one hundred have been partially redacted under Exemption 1.  Id. at 19-24.  The FBI's *Vaughn* index is in the form of a spreadsheet.  See id., Exh. I.  The index identifies the category of document (e.g., IOB Report), the bates number of the document, and the date of the document or a statement indicating the document is undated.  Id.  It also provides a brief description of the document, identifies the statutory exemption(s) claimed, states whether the document was withheld in full or released in part, and includes a code referring to an explanation for nondisclosure set forth in the accompanying declaration of David Hardy, the Section Chief of the Record/Information Dissemination Section, Records Management Division.  Id.; see Hardy Decl. ¶ 1, Dkt. 63-13.

In his declaration, Hardy avers that the "information withheld pursuant to Exemption 1 is currently and properly classified under E.O. 13256 [sic] at the SECRET level and meets the criteria for classification set forth in subparagraphs (c) and (d) of Section 1.4 of E.O. 13526 as the unauthorized disclosure of this information could reasonably be expected to cause serious damage to the national security of the United States."  Hardy Decl. ¶ 38.  To explain the basis for withholding information, the FBI's *Vaughn* index references at least one of four categories of information that are described in Hardy's declaration.  See id.

¶¶ 38-42.[12]  The Hardy declaration states in general terms why information in documents that fall within each category should be withheld.  Id.

The Court finds that the FBI's *Vaughn* submissions fail to provide the necessary detail and specificity required to justify the withholding of information under Exemption 1. Below, the Court will discuss examples that are representative of the overarching deficiencies in the FBI's *Vaughn* submissions.

The FBI's *Vaughn* index describes document "Cardozo-IOB-67-Cardoza-IOB-70" as "a four-page internal write up from the FBI to the IOB Board regarding IOB Matter 2008-1194.  This report concerns a highly sensitive joint investigation of the FBI and the U.S. Army."  Dkt. 63-14, Exh. I at 1.  The FBI's *Vaughn* index states that information is withheld on pages 67-70 of "Cardozo-IOB-67-Cardoza-IOB-70" under Exemption 1 pursuant to the categories of information described in the Hardy declaration as "standard terminology[/phraseology]" and "character of the case."  Id.  The explanation given by Hardy for the FBI's withholding of information that falls within the "character of the case" category is illustrative of the general descriptive nature of the four categories described by Hardy for the withholding information under Exemption 1:

> The classified information withheld as character of the case information in Category 1 identifies the character of a case for a specific type of and details related to intelligence activity directed at a specific target of national security interest.  Disclosure of this specific information could reasonably be expected to cause serious damage to the national security, as it would (a) disclose a particular intelligence or counterintelligence investigation; (b) disclose the nature, scope or thrust of the investigation and (c) reveal the manner of acquisition of the intelligence or counterintelligence information.

Hardy Decl. ¶ 40.

The same exact explanation is given for the withholding of information from over one hundred documents.  See Hardy Decl. at 21 n. 8.  The FBI has made no effort to tailor its explanation for nondisclosure under Exemption 1 to its numerous redactions.  Hardy's declaration does not provide a relatively detailed justification identifying the specific

---

[12] The FBI has withheld information from a single document under the category "standard terminology/phraseology" and information from more than one hundred documents under the category "character of the case."  See Hardy Decl. at 20 n. 7, 21 n. 8.

reasons why information was withheld under Exemption 1 on a document by document basis. Instead, Hardy states in general terms why each category of information should be withheld and the anticipated consequences of disclosure. Like the "boilerplate" explanations rejected in Wiener, the FBI's explanations are categorical descriptions of redacted material coupled with the categorical indication of anticipated consequences of disclosure, which are "clearly inadequate." Wiener, 943 F.2d at 978-979. By failing to identify the specific reason or reasons for withholding information from a particular document under Exemption 1, the FBI has not provided Plaintiff with a meaningful opportunity to challenge, and the Court an adequate foundation to review, the soundness of its decision to withhold information under Exemption 1. Hardy's generalized assertions and boilerplate fall far short of the detail required to demonstrate that information was properly withheld under FOIA. See id.; Campbell. 164 F.3d at 30 ("To justify summary judgment, a declaration must provide detailed and specific information demonstrating 'that material withheld is logically within the domain of the exemption claimed.' ").

Moreover, the Court finds that the FBI has failed to adequately describe the contents of the documents from which information was withheld. See Wiener, 943 F.2d at 979 ("Unless the agency discloses 'as much information as possible without thwarting the [claimed] exemption's purpose,' the adversarial process is unnecessarily compromised.") (citation omitted). The FBI did not disclose all it could. For example, the FBI describes the document "Hofmann-IOB-341" as: "A one page internal write up regarding IOB Matter 2004-21." Dkt. 63-14, Exh. I at 11. Given the categorical system the FBI has utilized to justify withholding information, there are no particular facts provided regarding the specific content of this document. This deficiency is present in numerous other documents. See id.[13]

---

[13] See, e.g., Hofmann IOB-602-603, Hofmann-IOB-612, Hofmann-IOB-711, Hofmann-IOB-769-771, Hofmann-IOB-866, Hofmann-IOB-885, Hofmann-IOB-1059, Hofmann-IOB-1447, Hofmann-IOB-1549, Hofmann-IOB-1566, Hofmann-IOB-2146, Hofmann-IOB-2164, Hofmann-IOB-2221, Hofmann-IOB-2224-2225, Hofmann-IOB-2255, Hofmann-IOB-2262, Hofmann-IOB-2268, Hofmann-IOB-2274, Hofmann-IOB-2281, Hofmann-IOB-2291, Hofmann-IOB-2297, Hofmann-IOB-2300, Hofmann-IOB-2309,

**B.      Exemption 5**

Exemption 5 protects "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  To be properly withheld under Exemption 5, "a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).  Specifically, Exemption 5 covers the attorney-client privilege, the attorney work-product privilege, and the executive deliberative process privilege. Maricopa, 108 F.3d at 1092.

Plaintiff contends that Defendants have improperly withheld information under Exemption 5.  Pl.'s Mtn. at 11-17.  Specifically, Plaintiff argues that the ODNI has improperly withheld records under the deliberative process privilege, the FBI and the DHS have improperly withheld records under the attorney-client privilege, and the ODNI has improperly withheld documents under the presidential communications privilege.  Id.

**1.      The Deliberative Process Privilege**

The ODNI has invoked the deliberative process privilege to protect information in over 200 documents.  See Dkt. 63-12.  The deliberative process privilege protects documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.  NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975); F.T.C. v. Warner Communications Inc., 742 F.2d 1156, 1161 (9th Cir. 1984).  The purpose of this privilege is "to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny."  Assembly of California v. United States Department of Commerce, 968 F.2d 916, 920 (9th Cir. 1992).  The Supreme Court has acknowledged that

---

Hofmann-IOB-2352, Hofmann-IOB-2516, Hofmann-IOB-2641, Hofmann-IOB-2730, Hofmann-IOB-3300, Hofmann-IOB-3316, Hofmann-IOB-3322, Hofmann-IOB-3328, Hofmann-IOB-3330, Hofmann-IOB-3346, and Hofmann-IOB-3438-3439.  Dkt. 63-14.

"[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," and "its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government."  Klamath, 532 U.S. at 8-9 (citations omitted).

To fall within the deliberative process privilege, the materials in question must be predecisional in nature and must also form part of the agency's deliberative process. Maricopa, 108 F.3d at 1093.  A document is predecisional if it was prepared in order to assist an agency decision maker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.  Id.  A predecisional document is part of the deliberative process if the disclosure of the materials would expose an agency's decision making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.  Id.; see also Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980) (describing a deliberative document as one that reflects the "give-and-take of the consultative process"); Vaughn, 523 F.2d at 1143-1144 (stating that for a document to be deliberative, it must be a "direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters").  Communications containing purely factual material are not typically within the purview of Exemption 5. Julian v. U.S. Dept. of Justice, 806 F.2d 1411, 1419 (9th Cir. 1986); see In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) (the deliberative process privilege does not protect "material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations").

"The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process."  Animal Legal Def.

Fund, Inc. v. Dep't of Air Force, 44 F.Supp.2d 295, 299 (D.D.C. 1999) (quoting Coastal States, 617 F.2d at 867).  "The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.' "  Senate of Puerto Rico v. U.S. Dep't of Justice, 823 F.2d 574, 585-586 (D.C. Cir. 1987).  In addition to explaining the function and significance of the documents in the agency's decision making process, the agency must describe the nature of the decision making authority vested in the office or person issuing the disputed documents, and the positions in the chain of command of the parties to the documents.  Arthur Andersen & Co. v. IRS, 679 F.2d 254, 258 (D.C. Cir. 1982).

Since the applicability of the deliberative process privilege depends on the content of each document and the role it plays in the decision making process, an agency's affidavit must correlate facts in or about each withheld document with the elements of the privilege.  Judicial Watch, Inc. v. U.S. Postal Service, 297 F.Supp.2d 252, 259-260 (D.D.C. 2004).  Without a sufficiently specific affidavit or *Vaughn* index, a court cannot decide, one way or the other, a deliberative process privilege claim.  Id. at 260 (citing Senate of Puerto Rico, 823 F.2d at 585 (finding that in the absence of "any identification of the specific final decisions to which . . . advice or recommendations contained in the withheld documents contributed," a court is "not positioned to pass upon the applicability . . . of this privilege")).  "In light of 'the strong policy of the FOIA that the public is entitled to know what its government is doing and why,' [E]xemption 5 is to be applied 'as narrowly as consistent with efficient Government operation.' "  Maricopa, 108 F.3d at 1093.

The ODNI's *Vaughn* index is in the form of a spreadsheet.  See Dkt. 63-12.  The index provides the following information about each document:  the document number assigned by the ODNI, the bates number of the document, the document's date, the date the document was released by the ODNI, the subject of the document, a code indicating whether the document is partially or entirely withheld, the claimed exemption(s), a brief explanation of why information was withheld, and the page count of the document.  See id.

at 3.  In support of its withholdings, the ODNI offers the declaration of John Hackett, Chief of the Information Management Group for the ODNI.  Hackett Decl. ¶ 1, Dkt. 63-5.

The Hackett declaration identifies four categories of withheld information under the deliberative process privilege: (1) "Intelligence Oversight Assessments for the IOB"; (2) "Emails and Inter-agency/Intra-agency Documents"; (3) "Draft Material"; and (4) "Internal Briefings, Talking Points, and Internal Memorandums."  Hackett Decl. ¶¶ 28, 31, 40, 46. The "Intelligence Oversight Assessments for the IOB" category includes six documents, the "Emails and Inter-agency/Intra-agency Documents" category includes 145 documents, the "Draft Material" category includes sixty-nine documents, and the "Internal Briefings, Talking Points, and Internal Memorandums" category includes fifteen documents.  Id. at 15 n. 8, 21 n. 18, 24 n. 22.  Immediately below, the Court will discuss the sufficiency of the ODNI's *Vaughn* submissions regarding the documents in categories two, three, and four. Because the ODNI has invoked the presidential communications privilege and the deliberative process privilege to justify the withholding of information from documents in category one, the Court will discuss the adequacy of the ODNI's submissions in this regard in the section titled "The Presidential Communications Privilege and the Deliberative Process Privilege."  See infra at III. B. 3.

With respect to the ODNI's withholding of information from documents in categories two, three, and four, the Hackett declaration generally describes the type of information that falls within each category and provides a general discussion regarding some of the documents that were redacted pursuant to the deliberative process privilege. See Hackett Decl. at 15-27.  The Hackett declaration also generally discusses the anticipated consequences of disclosing the withheld information in these categories.

Specifically, Hackett avers that the consequences of disclosure of information from documents in category two include the chilling of internal ODNI dialogue and deliberations related to the ODNI's reporting and oversight obligations under Executive Order 13462 (i.e., intelligence oversight assessments and ODNI quarterly reports), the underreporting of incidents or insufficiently detailed reports by intelligence agencies, and the impairment of

the working relationship between the ODNI and reporting agencies.  Hackett Decl. at 34-35, 38.  Hackett further avers that the consequences of disclosure of information from documents in category three include causing confusion by revealing premature policies and positions that may conflict with the final version, undermining the interagency coordination process by deterring agencies from sharing proposed policies, reports or statements with others, and thereby depriving agencies of the opportunity to fully debate the merits or feasibility of a proposed policy matter or position.  Id. ¶ 45.  Finally, as for documents in category four, Hackett states that the consequences of disclosing the withheld information include less candid and frank recommendations to senior officials.  Id. ¶ 51.

The Court finds that the ODNI has failed to satisfy its burden to demonstrate that the withheld information falls within the deliberative process privilege.  The ODNI has not provided a sufficiently detailed description of the contents of the documents at issue.  Nor has the ODNI provided a relatively detailed explanation identifying the specific reasons why information was withheld under the deliberative process privilege.  Hackett only offers a general description of the withheld information coupled with a generalized indication of possible consequences of disclosing the information.  Such a showing is insufficient to satisfy the reasonable specificity standard.  See Wiener, 943 F.2d at 979; Campbell, 164 F.3d at 30-31.  The ODNI has failed to provide a particularized explanation for its withholding of information on a document by document basis.  See Yonemoto, 686 F.3d at 688; see also King, 830 F.2d at 224 (the agency has the burden of demonstrating applicability of the exemptions invoked as to each document or segment withheld; the agency must supply "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply").  By failing to offer specific, tailored reasons describing why each document was withheld in full or in part under the deliberative process privilege, the ODNI has not provided Plaintiff with a meaningful opportunity to challenge, and the Court an adequate foundation to review, the soundness of its decision to withhold information under the claimed exemption.

1    The following examples demonstrate the insufficiency of the ODNI's *Vaughn*

2   submissions.  The ODNI's *Vaughn* index identifies the subject of Document 213 as

3   "Interagency Emails Regarding A Reported IOB Matter."  Dkt. 63-12 at 29.  The index

4   states that the information withheld consists of a "[r]equest to an agency for additional

5   information on a reported matter and subsequent internal ODNI email providing views on

6   the reported matter."  Dkt. 63-12 at 29.  This seventy-two page document was withheld in

7   full and is described as a "draft" in the Hackett declaration.  Hackett Decl. at 21 n. 18.

8   However, it is unclear from the ODNI's *Vaughn* submissions how "interagency emails" are

9   "drafts."  While Hackett avers that "at times . . . draft material would be attached to emails,"

10   and that drafts of intelligence oversight assessments and ODNI quarterly reports were

11   "frequently circulated between ODNI IOB Team[14] members for team review and comment

12   prior to finalization," Hackett Decl. ¶¶ 41-42, Hackett does not aver that an intelligence

13   oversight assessment and/or an ODNI quarterly report is attached to the email

14   correspondence.  Given the categorical system the ODNI has utilized to justify the

15   withholding of information, there are no particular facts provided in Hackett's declaration

16   regarding the specific contents of this document.  Nor does the declaration provide a

17   particularized explanation identifying the reasons why information was redacted from this

18   document under the deliberative process privilege.  This deficiency is present in numerous

19   other documents.[15]

20

21

22   _____

     [14] The ODNI IOB Team consists of "staff members from the ODNI Offices of
23   General Counsel and Inspector General as well as the ODNI Civil Liberties and Privacy
     Office, which serves in a consultative role to the team.  The ODNI IOB Team . . .
     participates in discussions with the IOB staff, attends meetings on behalf of the ODNI,
24   prepares the intelligence oversight assessments no less than twice each year, and executes
     the DNI's responsibilities as provided in Executive Orders 13462 and 12333."  Hackett
25   Decl. ¶ 12.

26       [15] Of the 229 documents withheld in full or in part under the deliberative process
     privilege in categories two, three and four, the Hackett declaration only generally discusses
27   twenty-eight documents.  See Hackett Decl. at 15-27.  The ODNI's failure to tailor its
     explanation for its withholding of specific documents or portions thereof deprives the Court
28   of an adequate foundation to assess whether the claimed exemption justifies nondisclosure.

Further, while the Hackett declaration discusses why disclosing emails and drafts in general would discourage candid discussion, neither the ODNI's *Vaughn* index nor the Hackett declaration provide sufficient detail to allow the Court to determine whether the ODNI properly withheld Document 213 in full under the deliberative process privilege. Hackett does not identify a specific decision, if any, this particular document is predecisional to, what its role, if any, in a specific deliberative process is, or how, if at all, releasing this particular document would expose the agency's decision making process in such a way as to discourage candid discussion. In addition, the ODNI's *Vaughn* submissions fail to identify the author(s) or recipient(s) of these emails and their respective positions in the agency's chain of command. Nor has the ODNI described in any fashion the nature of the decision making authority vested in the persons involved in sending and receiving the emails. Such contextual information is critical in assessing a deliberative process privilege claim.

Another example of the ODNI's deficient *Vaughn* submissions is Document 107, which is a twenty-two page document that is withheld in full. Dkt. 63-12 at 10. The ODNI describes this document as an "Internal tracking spreadsheet of each investigation or report by an [i.e., intelligence community] element and ODNI responses, actions or outstanding questions on each incident." Id. To justify nondisclosure, Hackett states: "[t]he ODNI IOB team maintains and updates spreadsheets and forms that track an incident reported by an [intelligence community] element, an [intelligence community's] reporting performance, and any remediation efforts." Hackett Decl. ¶ 35. Hackett further states that the release of such documents "may lead to underreporting of incidents or insufficiently detailed reports, potentially impairing the ODNI's ability to accurately assess the true nature and status of the agency's investigation." Id.

As an initial matter, neither the Hackett declaration nor the ODNI's *Vaughn* index explains whether Document 107 was withheld in full or in part under the deliberative process privilege. The *Vaughn* index states that the document was withheld in full, and that information was withheld under Exemptions 1, 3, and 5. While the Defendants correctly

point out that Plaintiff does not challenge the withholding of information under Exemptions 1 and 3, the ODNI's *Vaughn* submissions fail to specify what portions of Document 107 are withheld under Exemptions 1, 3, and 5.  As such, it is unclear whether any portion of this document is subject to disclosure.  To the extent that Document 107 is not withheld in full under Exemptions 1 and 3, and that portions of this document are redacted exclusively under Exemption 5, the Court finds that the ODNI has failed to justify nondisclosure based on the deliberative process privilege.

The ODNI's *Vaughn* submissions lack sufficient detail and specificity showing how and why the redacted material falls within the deliberative process privilege.  The ODNI's submissions do not sufficiently explain how any portion of the spreadsheet is deliberative. For instance, Hackett's declaration does not describe the contents of the document as reflecting the give-and-take of the consultative process.  Hackett does not state that the document makes recommendations or expresses advisory opinions on legal or policy matters.  Further, Hackett fails to explain the role played by this document in the course of a specific deliberative process or provide a particularized explanation of how the disclosure of this document or portions thereof would expose the agency's decision making process in such a way as to discourage candid discussion and thereby undermine the ODNI's ability to perform its functions.  Nor has Hackett described the positions in the chain of command of the parties to the document.  Such contextual information is critical to assessing a deliberative process privilege claim.  Absent more information, the Court is unable to evaluate whether any portion of Document 107 has been properly withheld under Exemption 5.

Another notable example of an insufficient submission is Document 22, which is described in ODNI's *Vaughn* index as "Emails Discussing Times and Location for Meeting on IC Reporting Best Practices."  Dkt. 63-12 at 8.  The index states that the withheld information concerns a "[r]equest for [a] meeting to obtain advice on best practices and the suggestion of a topic for discussion at an upcoming meeting concerning an agency's efforts with a program."  Id.  Hackett states that emails regarding "agendas or issues that should be

discussed in greater detail at meetings . . . are meant to garner opinion, generate debate and formulate strategies."  Hackett Decl. ¶ 37.

The Court finds that the ODNI's vague description of the deliberative process involved does not provide sufficient information to determine whether the email falls within the deliberative process privilege.  Hackett's declaration does not specifically discuss Document 22, let alone identify the specific deliberative process to which the withheld email contributed and the role the email played in that process.  Indeed, the ODNI's vague reference to a "discussion at an upcoming meeting concerning an agency's efforts with a program" provides no factual context for the Court.  Further, the ODNI has failed to identify the author and recipient(s) of the email, or describe the nature of the decision making authority vested in the parties to the email and their relative positions in the agency's chain-of-command or relevance of the email to a specific decision.  Without a more detailed *Vaughn* index and supporting declaration, Plaintiff does not have a meaningful opportunity to contest, and the Court does not have an adequate foundation to assess, the soundness of the ODNI's withholding of information under the deliberative process privilege.

Finally, the Court notes that the ODNI has withheld over 150 documents in full based on the deliberative process privilege.  See Dkt. 63-12; see Hackett Decl. ¶ 23 (stating that over 783 pages have been withheld in full).  However, the ODNI has failed to provide a sufficient justification for the withholding of these documents in their entirety.  The ODNI has not clearly described the methods used to segregate non-exempt material from exempt material.  Nor has the ODNI described in detail its release of all factual information that does not "expose the deliberative process" or is not "inextricably intertwined with policy-making processes."  Nat'l Wildlife Fed'n, 861 F.2d at 1119.  Instead, Hackett simply avers that "[a]ll reasonably, segregable, non-exempt material has been released.  In instances where attempts to segregate the material resulted in the releases that would not be meaningful or almost entirely blacked out, the ODNI withheld those materials in full."

Hackett Decl. ¶ 23.  Hackett's conclusory averments are insufficient to justify nondisclosure.[16]

## 2.  The Attorney-Client Privilege

The FBI has invoked the attorney-client privilege to withhold information from sixteen documents, while the DHS has invoked the privilege to withhold information from two documents.  See Dkt. 63-14, Exh. I; Dkt. 63-4.  Plaintiff contends that the FBI and the DHS have waived the attorney-privilege because the "legal advice" contained in the withheld information has been disclosed to third parties (e.g., the IOB) that are not covered by the privilege.  Pl.'s Mtn. at 16.  Plaintiff also argues that the FBI and the DHS have failed to show that the withheld information concerns confidential communications between an attorney and a client.  Pl.'s Reply at 8.

Exemption 5 has been construed to protect the attorney-client privilege.  United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984).  "The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services," as well as "communications from attorneys to their clients if the communications rest on confidential information obtained from the client."  Tax Analysts v. Internal Revenue Serv., 117 F.3d 607, 618 (D.C. Cir. 1997).  In the FOIA context, the agency is the "client" and the agency's lawyers are the "attorneys" for the purposes of attorney-client privilege.  Coastal States, 617 F.2d at 863.

An attorney-client privilege is established "(1) [w]hen legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at

---

[16] Because the ODNI's *Vaughn* submissions fail to describe the documents and explain the reasons for the withholding of information under the deliberative process privilege with reasonably specific detail, the Court lacks an adequate foundation to resolve Plaintiff's contention that the ODNI has improperly withheld factual information, documents in full as "drafts," and records reflecting final agency positions.  Indeed, given the ODNI's showing, Plaintiff speculates that the "ODNI has withheld records that *likely* reflect final agency positions," and that "[i]n withholding over seven hundred pages of records in their entirety and 743 pages in part, it is a *near-certainty* that ODNI has withheld some purely factual material."  Pl.'s Mtn. at 14-15 (emphasis added).

the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived."  U.S. v. Martin, 278 F.3d 988, 999 (9th Cir. 2002).  A "fundamental prerequisite to the assertion of the privilege" is "confidentiality both at the time of the communication and maintained since."  Coastal States, 617 F.2d at 863.

The privilege does not allow an agency to withhold a document or portions thereof merely because it is a communication between the agency and its lawyers.  Coastal States, 617 F.2d at 862-863.  The agency bears the burden of showing that the information exchanged was confidential.  Mead Data Cent., 566 F.2d at 253.  That is, the agency must show that it supplied information to its lawyers with the expectation of secrecy and the information was not known by or disclosed to any third party.  See id. at 254; In re Sealed Case, 737 F.2d at 99 (the agency has the burden to present to the court sufficient facts to establish the privilege; "the claimant must demonstrate with reasonable certainty . . . that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure"); see Center for Biological Diversity v. Office of Management and Budget, 625 F.Supp.2d 885, 892 (N.D. Cal. 2009) (in the context of a *Vaughn* index, the agency has the burden to show that documents involved the provision of specific legal advice and that they were intended to be confidential and were kept confidential).  The use of boilerplate language to justify nondisclosure, where "no effort is made to tailor the explanation to the specific document withheld," does not meet this burden.  See Wiener, 943 F.2d at 978-979.

### a.  The FBI

The Court finds that the FBI has failed to carry its burden to demonstrate that the information it withheld falls within the scope of the attorney-client privilege.  The FBI's *Vaughn* index lacks the specificity required for the Court to assess whether the withheld information is exempt from disclosure under the attorney-client privilege.  The document descriptions in the FBI's *Vaughn* index do not identify how a lawyer is involved or identify

1   how the document contains legal advice.  A few examples elucidate the deficiencies in the

2   FBI's *Vaughn* index.

3       The FBI describes "Cardozo-IOB-285" as "[a] one-page internal write up from the

4   FBI to the IOB Board regarding IOB Matter 2007-1471.  This report concerns the FBI's

5   over-collection of information due to the inputting of the incorrect termination date of

6   surveillance."  Dkt. 63-14, Exh. I at 3.  The FBI describes another document, "Hoffman-

7   IOB-769-Hoffman-IOB-771," as "[a] three page internal write-up regarding IOB Matter

8   2006-307."  Id. at 35.  Another document,"Cardozo-IOB-67-Cardozo-IOB-70," is described

9   as "[a] four page internal write up from the FBI to the IOB Board regarding IOB Matter

10  2008-1194.  This report concerns a highly sensitive joint investigation of the FBI and U.S.

11  Army."  Id. at 1.  The document descriptions provided by the FBI are of such a vague and

12  general nature that they fail to provide the Court with a foundation to assess whether the

13  attorney-client privilege has been properly invoked.

14      The supporting Hardy declaration states that Cardozo-IOB-285 was "withheld in

15  part under the attorney-client privilege because [it] contain[s] legal advice from [the FBI's

16  Office of General Counsel ("OGC")] to FBI Field Offices regarding actions to be taken

17  after the inadvertent but unauthorized collection of information during a foreign

18  counterintelligence or international terrorism investigation."  Hackett Decl. ¶ 44.[17]  Hardy

19  further states that "Cardozo-IOB-70 and Hofmann-IOB-771 were withheld in part under the

20  attorney-client privilege because they contain legal advice provided by the OGC to FBI

21  investigative teams regarding permissible activities during intelligence gathering

22  investigations."  Id.  Hardy avers that "[d]isclosure of these attorney-client communications

23  . . . would impede a client's willingness to fully disclose information in seeking legal advice

24  or temper their willingness to seek legal advice as well as reveal the preliminary mental

25  impressions of OGC attorneys regarding potential legally challengeable actions taken

26  during an investigation which would hinder the FBI's ability to accomplish its mission."  Id.

27  _____

28      [17] Hardy states that "Cardozo-IOB-120, 122, . . . 287, 289, 291,293, 295, 297, 299 and Hofmann-IOB-687" are withheld for the same reason.  Hardy Decl. ¶ 44.

1    The FBI's *Vaughn* submissions are not sufficiently detailed to permit the Court to

2    determine, on a document by document basis, whether the attorney-client privilege applies.

3    The FBI has failed to describe with a reasonable level of specificity the nature of the legal

4    issues for which advice was being sought by the FBI and whether the withheld information

5    conveys legal advice predicated on confidential information provided by the FBI.  Further,

6    the FBI has not provided sufficient information from which the Court can conclude that the

7    redacted documents involve the provision of specific legal advice and that they were

8    intended to be confidential and were kept confidential.  As a result of the FBI's deficient

9    *Vaughn* submissions, the Court does not have enough information to determine, one way or

10   the other, whether the attorney-client privilege applies.  Without additional facts, the FBI

11   cannot rely on the attorney-client privilege to justify its failure to disclose the information.

12                               **b.    The DHS**

13   The DHS has invoked the attorney-client privilege to protect portions of two

14   documents.  Dkt. 63-4 at 3, 8.  The DHS's *Vaughn* index states that it has partially released

15   a document described as a "Memo to Mr. Coldebella and Mr. Skinner re: Intelligence

16   Oversight Inquiry into the Production and Dissemination of an Office Intelligence and

17   Analysis Intelligence Note (Mar. 28, 2008)."  Id. at 3.  The index further states that "[t]he

18   redacted information consists of legal advice rendered by an attorney in the DHS Office of

19   the General Counsel regarding the legal sufficiency of an intelligence product.  The

20   communication relates to [a] matter for which legal advice has been sought, and the

21   communication has been held in confidence within the government. . . ."  Id.  The DHS has

22   also partially released a document described as a "Letter to Mr. Pointer from Mr. Skinner

23   and Mr. Coldebella forwarding April 2008-June 2008 Intelligence Oversight Quarterly

24   Report (Nov. 24, 2008)."  Id. at 8.  The *Vaughn* index states that "[t]he redacted

25   information consists of (1) recommendations made by the Intelligence Oversight Officer

26   for the DHS Office of intelligence and Analysis to address a putative intelligence oversight

27   violation and (2) legal advice rendered by the DHS Office of the General Counsel to the

28   DHS Office of Intelligence and Analysis regarding the same matter."  Id.  The supporting

1  declaration submitted by Andrew Fausett, attorney-advisor in the DHS's Office of the

2  General Counsel, Intelligence Division, states that "[s]ome of the withheld information

3  consisted of communications between a DHS attorney and a client concerning the provision

4  of advice on a legal matter for which the client solicited professional advice, which is

5  normally privileged in the civil discovery context and therefore exempt from disclosure

6  pursuant to §552(b)(5)."  Fausett Decl. ¶ 16, Dkt. 63-3.

7       The Court finds that the DHS's justifications for nondisclosure are insufficient.  The

8  DHS's generalized, non-specific descriptions of the withheld information fail to establish

9  that the attorney-client privilege has been properly invoked.  The DHS has not adequately

10  shown that material for which the attorney-client privilege has been invoked involved

11  confidential communications or that it related to a specific legal matter for which the DHS

12  sought legal advice.  The conclusory assertions in the *Vaughn* index are insufficient to

13  permit the Plaintiff to challenge, and the Court to make a reasoned determination, whether

14  the exemption claimed justifies nondisclosure.  Moreover, Fausett's declaration provides

15  the type of boilerplate explanation that the Ninth Circuit in <u>Wiener</u> rejected as clearly

16  inadequate.  <u>Wiener</u>, 943 F.2d at 978-979.  Fausett's declaration falls far short of providing

17  the detail required to support DHS's claimed exemption.[18]

18            **3.  The Presidential Communications Privilege and the Deliberative**
                **Process Privilege**

19
20       The ODNI has invoked the presidential communications privilege and the

21  deliberative process privilege to withhold information from six documents, i.e., Documents

    14-19.  <u>See</u> Dkt. 63-12.
22

23                   **a.  Presidential Communications Privilege**

24       Exemption 5 has been construed to incorporate the presidential communications

25  privilege.  <u>See</u> <u>Sears</u>, 421 U.S. at 149 n. 16.  The presidential communications privilege, a

26       _____

27       [18] Because the FBI and the DHS have failed to provide sufficient information for the
    Court to determine whether the withheld information falls within the attorney-client
    privilege, and because the parties have failed to adequately brief the issue of whether the
28  FBI's and the DHS's disclosure of records to the IOB that contain "legal advice" waives the
    attorney-client privilege as a matter of law, the Court will not reach this issue.

presumptive privilege for presidential communications, preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially.  Loving v. Department of Defense, 550 F.3d 32, 37 (D.C. Cir. 2008).  It applies to "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."  In re Sealed Case, 121 F.3d at 744.  In addition to protecting communications directly with the President, the privilege protects "communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.  Only communications at that level are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers."  Id. at 752.  "[T]he privilege only applies to communications that these advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters."  Id.  The privilege does not apply, however, to "communications of staff outside the White House in executive branch agencies that were not solicited and received by such White House advisers."  Judicial Watch, 365 F.3d at 1116.  Unlike the deliberative process privilege, "the presidential communications privilege applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones."  In re Sealed Case, 121 F.3d at 745.

The six documents withheld in part by the ODNI pursuant to the presidential communications privilege are all described as "ODNI Memo for PIAB/IOB: Review of IC Reporting" for a particular quarter in the calendar year 2007 or 2008.  See Dkt. 63-12 at 3-8.  The ODNI's Vaughn index justifies withholding portions of these documents because they contain:

> Analysis of and report to the [PIAB] relating to the status of reporting activity, investigations, and actions between ODNI and other IC [i.e., intelligence community] elements.  The report was made to facilitate the PIAB's obligation under executive orders to make reports and recommendations to the President concerning intelligence oversight.  Release

of this information would inhibit the candid exchanges necessary for the PIAB to fulfill its obligation to make recommendations to the President. Id.

The supporting Hackett declaration describes the redacted documents as "Intelligence Oversight Assessments for IOB," which concern "the gravity, frequency, trends, and patterns of occurrences of intelligence activities that may be unlawful or contrary to Executive Order or Presidential Directive as well as an assessment of the effectiveness of correcti[ve] action taken by the DNI or the head of the department concerned with respect to these intelligence activities."  Hackett Decl. ¶ 28.  Hackett states that after the ODNI reviews reports submitted to it by the heads of the agencies of the intelligence community (which include explanations, justifications and any remediation efforts underway by the reporting intelligence community agency), the ODNI assesses whether each intelligence community agency has complied with its reporting obligations under Executive Order 13462, identifies any problematic trends across the intelligence community agency or the intelligence community, and provides recommendations for the IOB's consideration through the ODNI's intelligence oversight assessments.  Id.  Hackett further states that, as required by Executive Order 13462, the IOB "reviews the ODNI's quarterly reports of reportable ODNI intelligence activities, intelligence oversight assessments[,] . . . and any immediate reports of significant or highly sensitive matters.  In turn, the IOB provides appropriate recommendations to the President on national security policy and as to whether any current intelligence policies and procedures warrant change or immediate attention."  Id. ¶ 29.

As discussed above, Executive Order 13462 established the PIAB and its five-member committee, the IOB, within the Executive Office of the President for the exclusive purpose of advising and assisting the President on the activities of the intelligence community.  Exec. Order 13462 §§ 3, 4.  Under the order, the DNI is required to analyze reports submitted by intelligence community agencies to the IOB concerning any intelligence activities within those agencies that may be unlawful or contrary to Executive

order or presidential directive, and to provide the IOB, as necessary and no less than twice each year, an analysis of these reports, including an assessment of "the gravity, frequency, trends, and patterns of occurrences of intelligence activities" that may be unlawful or contrary to Executive Order or presidential directive.  See id. §§ 6, 7; Exec. Order 12333 § 1.7(d).  The DNI is also required to submit to the IOB, as necessary and no less than twice each year, an assessment of the effectiveness of corrective action taken by the DNI or the head of the department concerned with respect to intelligence activities that may be unlawful or contrary to Executive Order or presidential directive.  See Exec. Order 13462 §§ 6, 7.

Executive Order 13462 further provides that the IOB must "review information submitted by the DNI. . . and make recommendations thereon, including for any needed corrective action, with respect to such information, and the intelligence activities to which the information relates, as necessary, but not less than twice each year, to the President, the DNI, and the head of the department concerned."  Exec. Order 13462 § 6.  "Consistent with the policy set forth in section 1 of th[e] order,[19] the IOB [must] . . . inform the President of intelligence activities that the IOB believes . . . may be unlawful or contrary to Executive Order or presidential directive; and . . . are not being adequately addressed by the Attorney General, the DNI, or the head of the department concerned; or . . . should be immediately reported to the President."  Id. § 6.

The Court finds that the ODNI has properly invoked the presidential communications privilege to withhold information from Documents 14-19.[20]  These documents are protected from disclosure under the presidential communications privilege

---

[19] Section 1 of the order states: "[i]t is the policy of the United States to ensure that the President and other officers of the United States with responsibility for the security of the Nation and the advancement of its interests have access to accurate, insightful, objective, and timely information concerning the capabilities, intentions, and activities of foreign powers."  Exec. Order 13,462 § 1.

[20] While the ODNI partially redacted the six documents at issue, the presidential communications privilege protects entire documents.  In re Sealed Case, 121 F.3d at 745.  The ODNI offers no explanation for why it released portions of these documents.

because they were "solicited and received" by immediate White House advisers (i.e., the IOB) who have "broad and significant responsibility for investigating and formulating the advice to be given the President" on intelligence matters under Executive Order 13462. The IOB solicited and received the documents from the ODNI in the course of performing its sole function of advising and assisting the President on intelligence community activities under Executive Order 13462. The information in Documents 14-19 provide the basis for the IOB to fulfill its obligation under Executive Order 13462 to formulate advice and recommendations for the President to make decisions in his capacity as Commander-in-Chief and Chief Executive of the Executive Branch concerning intelligence activities that may be unlawful or contrary to Executive Order or presidential directive, and corrective action taken by the DNI or the head of another intelligence agency regarding such activities. The information in the documents relate to presidential decision making on national security policy; specifically, the President's decisions regarding intelligence policies and procedures. Accordingly, Documents 14-19 are protected by the presidential communications privilege and are exempt in their entirety from disclosure under FOIA.

### b.    The Deliberative Process Privilege

In addition, the Court finds that the ODNI has properly invoked the deliberative process privilege to withhold information from Documents 14-19. In this regard, the Hackett declaration states that the withheld information "protects the ODNI's evaluation of each agency's reporting efforts, updates from agencies on sensitive matters under review or investigation, the ODNI's review of the effectiveness of an agency's remediation efforts, the identification of trends and patterns in the [intelligence community's] reporting activities, and recommendations submitted for the IOB's consideration." Id. Hackett further states that the "disclosure of deliberative material contained in these intelligence oversight assessments would reveal the ODNI's deliberative analyses and recommendations to the IOB," and that if "the ODNI IOB team had to consider the public reaction, or even other agencies' reactions, to its intelligence oversight assessments, they will likely be less frank in

their assessments and will be inhibited from freely and candidly providing evaluations of an agency's performance on intelligence oversight compliance."  Id.

The Court finds that Documents 14-19 contain predecisional information because they were prepared by the ODNI to assist the IOB in fulfilling its obligation to advise the President on intelligence community activities under Executive Order 13462.  The Court finds that the documents are also deliberative because they contain intelligence oversight assessments and recommendations related to intelligence policy matters for the IOB's consideration in formulating advice and recommendations to the President.  However, because the ODNI failed to conduct an adequate segregability analysis, it is unclear whether the ODNI has released all non-exempt portions of Documents 14-19.  The ODNI has not described in detail its release of all factual information that does not "expose the deliberative process" or is not "inextricably intertwined with policy-making processes." Nat'l Wildlife Fed'n, 861 F.2d at 1119.  Instead, Hackett simply states that "[a]ll reasonably segregable, non-exempt material has been released."  Hackett Decl. ¶ 23.  It is not sufficient for an agency to simply conclude that there is no segregable information without explaining its reasons for such a conclusion.  Mead Data, 566 F.2d at 261.  An agency must provide a "detailed justification" and not just "conclusory statements" to prove that it has released all reasonably segregable information.  Id.  Accordingly, absent more information, the Court cannot conclude that the ODNI has released all non-exempt material from Documents 14-19.

    **C.    Exemption 7**

Plaintiff contends that the FBI has improperly withheld information under Exemption 7(D), and that the FBI and the DHS have improperly withheld information under Exemption 7(E).  Pl.'s Mtn. 17-23.  Specifically, Plaintiff argues that the FBI has failed to show that the information it withheld under Exemption 7(D) was conveyed to the agency under an implied grant of confidentiality.  See id. at 17-19.  In addition, Plaintiff argues that, for each of the categories of records the FBI withheld under Exemption 7(E), the FBI has failed to show that releasing the records would allow criminals to circumvent

1  detection, apprehension, or prosecution.  Id. at 20-21.  Finally, Plaintiff argues that the FBI

2  and the DHS have improperly withheld information concerning law enforcement

3  techniques under Exemption 7(E) that are generally known or routine.  Id. at 21-22.

4         **1.       Exemption 7(D)**

5         Exemption 7(D) protects from disclosure records or information compiled for law

6  enforcement purposes that "could reasonably be expected to disclose the identity of a

7  confidential source . . . [who] furnished information on a confidential basis, and, in the case

8  of a record or information compiled by a criminal law enforcement authority in the course

9  of a criminal investigation . . ., information furnished by a confidential source.  5 U.S.C. §

10  552(b)(7)(D).  The mere fact that a person provides information to a law enforcement

11  agency does not render that person a "confidential source" within the meaning of

12  exemption 7(D).  See United States Dep't of Justice v. Landano, 508 U.S. 165, 178, 181

13  (1993).  Rather, exemption 7(D) applies only when "the particular source spoke with an

14  understanding that the communication would remain confidential."  Id. at 172.  "Such

15  understandings are reasonable when the law enforcement agency receiving information

16  provides either an express or implied assurance of confidentiality."  Campbell, 164 F.3d at

17  34.

18         When invoking Exemption 7(D), an agency must demonstrate, through the use of

19  reasonably detailed *Vaughn* submissions, that the information was compiled for a law

20  enforcement purpose, that an informant provided the information under an express or

21  implied promise of confidentiality, and that disclosure could reasonably be expected to

22  disclose the source's identity.  Landano, 508 U.S. at 171-172.  An express assurance of

23  confidentiality is shown by an agency's proffer of "probative evidence that the source did in

24  fact receive an express grant of confidentiality."  Campbell, 164 F.3d at 34.  When the

25  agency claims an implied assurance of confidentiality, the proper inquiry is "whether the

26  particular source spoke with an understanding that the communication would remain

27  confidential."  Landano, 508 U.S. at 172.  An implied assurance of confidentiality may be

28  inferred from evidence showing the circumstances surrounding the imparting of the

information, including the nature of the criminal investigation, the informant's relationship to it, whether the source received payment, and whether the source has an "ongoing relationship" with the law enforcement agency and typically communicates with the agency "only at locations and under conditions which assure the contact will not be noticed." Id. at 179. "No matter which method the agency adopts to meet its burden of proof, its declarations must permit meaningful judicial review by providing a sufficiently detailed explanation of the basis for the agency's conclusion." Campbell, 164 F.3d at 34.

The FBI has partially redacted over sixty documents (i.e., IOB Reports) based on an implied grant of confidentiality under Exemption 7(D). See Dkt. 63-14, Exh. I. The supporting Hardy declaration states that the information withheld under Exemption 7(D) "pertain[s] to communications between the FBI and the [IOB], . . . which are an essential reporting tool utilized by the FBI to conduct oversight reviews of its operations taken in connection with national security investigations," and that this information falls within "the law enforcement duties of the FBI." Hardy Decl. ¶ 33. Hardy further states that the "information [at issue in this case] has been withheld due to an implied assurance of confidentiality," and that the "disclosure of the identities of these individuals could have disastrous consequences" given that these "third parties provided information of value to the FBI concerning these investigations, and in doing so, have placed themselves in harm's way should the subjects of these investigations become aware of the third parties' cooperation with the FBI." Id. ¶¶ 35, 45

To justify nondisclosure, the FBI relies on the Hardy declaration, which generally explains why information contained in the redacted documents was properly withheld. Hardy Decl. ¶ 45; id. at 26-27 n. 14. Hardy states that Exemption 7(D) has been asserted with regard to IOB Reports "to protect the names, identifying information for, and information provided by, third parties to the FBI or other law enforcement agencies in the investigative files under an implied assurance of confidentiality." Id. ¶ 45. Hardy further states that these "third parties provided information concerning the activities of individuals who were of interest to the FBI in its investigations related to potential threats to national

security," and "provided specific detailed information that is singular in nature concerning the activities of the subjects of the FBI's national security investigations." Id.  According to Hardy, "[t]he information the third parties provided under an implied assurance of confidentiality warrants the protection of the third party names as well as the singular information they provided." Id.

The Court finds that the FBI has not satisfied its burden to demonstrate that it has properly invoked Exemption 7(D) to withhold information.  The Hardy declaration fails to provide a sufficiently detailed and particularized explanation of the basis for the agency's nondisclosure.  Hardy's declaration lacks specific details demonstrating that any informant provided the FBI information based on an implied assurance of confidentiality, and that disclosure could reasonably be expected to disclose the source's identity.  The FBI has made no effort to tailor its explanation for nondisclosure on a document by document basis.  Instead, the FBI has proffered generalized and conclusory reasons for redacting sixty documents pursuant to Exemption 7(D).  Although the Court may be able to infer from these generalized conclusions that the requirements for nondisclosure are met, the Court is reticent to make such an inference.  Absent a particularized explanation of why Exemption 7(D) applies to information withheld from a document, Plaintiff does not have a meaningful opportunity to contest, and the Court does not have an adequate foundation to assess, whether the claimed exemption applies.

## 2.    Exemption 7(E)

Exemption 7(E) protects from disclosure law enforcement "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  In order to withhold information under this exemption, an agency must demonstrate that the withheld information was "compiled for law enforcement" purposes by establishing a "rational

nexus" between " 'enforcement of a federal law and the document for which' " the exemption is claimed.  <u>Rosenfeld v. United States Dep't of Justice</u>, 57 F.3d 803, 808 (9th Cir. 1995).  The agency must also demonstrate, by detailed affidavit or other evidence, that release would reasonably risk circumvention of the law.  <u>See</u> <u>Feshbach v. SEC</u>, 5 F.Supp.2d 774, 787 (N.D. Cal. 1997) (rejecting withholding under Exemption 7(E) where government failed to "provide non-conclusory reasons why disclosure of each category of withheld documents would risk circumvention of the law.").

In the Ninth Circuit, "Exemption 7(E) only exempts investigative techniques not generally known to the public."  <u>Rosenfeld</u>, 57 F.3d at 815.  Similarly, "routine" techniques that "would leap to the mind of the most simpleminded investigator" cannot be shielded from disclosure.  <u>Id.</u>  However, the government may withhold detailed information regarding a publicly known technique where the public disclosure did not provide "a technical analysis of the techniques and procedures used to conduct law enforcement investigations."  <u>See</u> <u>Bowen v. U.S. Food & Drug Admin.</u>, 925 F.2d 1225, 1228-1229 (9th Cir. 1991).

### a.    The FBI

The FBI has withheld portions of numerous IOB Reports pursuant to Exemption 7(E).  <u>See</u> Dkt. 63-14, Exh. I.  The FBI places the redacted IOB Reports into seven general categories: (1) "Identities of FBI Field Offices referenced in the reporting of IOB violations of IOB reports, the identity of a squad or unit, and its members involved in a National Security investigation"; (2) "Internet 'World Wide Web' or 'www' addresses and e-mail addresses of individuals under investigation"; (3) "The type of investigation, Preliminary or Full Field Investigation, when referenced with an actual investigation and not in general discussion and the dates upon which those investigation were initiated"; (4) "The specific procedures used during an investigation of an internet website and/or of an e-mail account"; (5) "The identity--and explanation--of a computer system utilized during national security investigations"; (6) "Specific law enforcement techniques utilized to conduct national security and intelligence investigations"; and (7) "Specific techniques and procedures used

during an investigation to handle information inadvertently collected without authorization." See e.g., Hardy Decl. at 27-33, 35-37, 39-41.  The FBI's justifications for nondisclosure under 7(E) are set forth in the Hardy declaration.  See Hardy Decl.

The Court finds that the Hardy declaration lacks sufficient specificity to justify the FBI's nondisclosure of information under Exemption 7(E).  For example, Hardy explains that information from documents within category one was withheld under Exemption (7)(E) to "protect the identifying information of the field office conducting the national security investigation as well as the name or identifying information of the squad/unit/team conducting the investigation." Hardy Decl. ¶ 46.  Hardy asserts that the "[r]elease of this information would allow a potential criminal to piece together seemingly random bits of information to form a mosaic as to how the FBI conducts its national security investigatory efforts.  This could foster circumvention of the law within particular geographic areas and/or the activities of the specific squad or units involved in the investigation." Id.  Based on this description, the FBI has withheld information from approximately 150 documents. Hardy Decl. at 27-28 n. 15.

In addition, Hardy explains that information from documents within category six was withheld under Exemption (7)(E) to protect specific law enforcement techniques used to conduct national security and intelligence investigations.  Hardy Decl. at 32-33.  Hardy asserts that the "[r]elease of the details of specific law enforcement techniques utilized by the FBI to conduct national security and intelligence investigations would aid individuals in circumventing the law and promoting the invention of countermeasures which would undermine the FBI's investigative methods with respect to its intended target."  Id. ¶ 51. Based on this description, the FBI has withheld information from over 160 documents. Hardy Decl. at 32 n. 21.

These examples are representative of the FBI's inadequate categorical approach to withholding information under Exemption 7(E).  See Wiener, 943 F.2d at 978-979 (rejecting categorical approach because it affords the requester little or no opportunity to argue for the release of particular documents).  The FBI has withheld information from

numerous documents without providing a description of how, for each specific document, the release of that information would reasonably risk circumvention of the law.  Nor did the FBI explain for each specific withholding regarding a law enforcement technique that the information withheld goes beyond a generally known technique.  Instead, the Hardy declaration states in general terms why each category of information should be withheld and the anticipated consequences of disclosure.  Like the "boilerplate" explanations rejected in Wiener, the FBI's explanations are categorical descriptions of redacted material coupled with the categorical indication of anticipated consequences of disclosure, which are "clearly inadequate."  See id. at 978-979.  Given the FBI's generalized description of the withheld information and its conclusory justifications for nondisclosure under Exemption 7(E), the FBI did not afford Plaintiff a meaningful opportunity to contest, and the Court an adequate foundation to review, the soundness of the its withholdings.

### b.    The DHS

The DHS has withheld thirteen documents in part under Exemption 7(E).  See Dkt. 63-4.  The DHS provides the justifications for its withholdings in its *Vaughn* index and in the declaration of Fausett.  See Fausett Decl.; Dkt. 63-4.  Fausett states that information was withheld from documents pursuant to Exemption 7(E) because "the information . . . was compiled in furtherance of the DHS I&A's statutory responsibilities . . . to provide intelligence and analysis in support of the broader statutory responsibilities of the DHS to ensure security of the homeland . . . and . . . pertains to techniques and procedures used by the DHS I&A or would disclose guidelines for DHS I&A analytic activities, the disclosure of which reasonably could be expected to lead to circumvention of criminal laws relating to the DHS's homeland security missions."  Fausett Decl. ¶ 17.

The Court finds that the Fausett declaration is insufficient to justify the withholding of information under Exemption 7(E) because Fausett simply parrots the language of the claimed exemption without providing any detail as to why the release of the withheld portions of the documents would reasonably risk circumvention of the law.  Further, while DHS's *Vaughn* index states that the redacted information "references a collection

technique" or "references an intelligence technique," Fausett's declaration provides no explanation as to whether and why any specific investigative "technique" mentioned in the *Vaughn* index is not generally known to the public.  Nor does Fausett provide a particularized explanation as to the specific context of each redaction and the nature of the harm expected if disclosed.

The DHS's justifications for withholding information in its *Vaughn* index are similarly inadequate.  An example illustrates the DHS's inadequate justifications for nondisclosure.  The DHS has withheld portions of Document 25, which is described as a "Letter to Michael Chertoff, Secretary of DHS, from Senators Feingold and Rockefeller, cc Charles Allen, Under Secretary for Intelligence Analysis (July 31, 2008)."  Dkt. 63-4 at 10.  The DHS withheld information from this document on the ground that the "information references an intelligence technique, the disclosure of which could reasonably be expected to lead to circumvention of criminal laws relating to DHS's homeland security missions."  Id. at 11.  The DHS's explanation for withholding information is too vague to justify nondisclosure.

Given the lack of detail in the DHS's *Vaughn* submissions, the Court is unable to determine whether the DHS has properly invoked Exemption 7(E) to withhold information.  The conclusory language used by DHS is clearly inadequate.  The DHS has not provided a specific, relatively detailed explanation as to how disclosure of the redacted information pertains to an investigative technique that is not generally known, and how the release of this information could reasonably lead to circumvention of criminal laws.[21]

///

///

---

[21] Finally, Plaintiff argues that the DHS and the FBI have improperly withheld guidelines and policies that regulate an agency's dealings with the public under Exemptions 5 and 7(E).  Pl.'s Mtn. at 22.  In support of its argument, Plaintiff cites three documents.  Id. at 23.  Having reviewed the *Vaughn* submissions submitted in connection with these documents, the Court finds that the descriptions of these documents and the explanations for nondisclosure lack sufficient detail for the Court to evaluate whether the information was properly withheld under the claimed exemptions.

**D.    Segregability**

Under FOIA, an agency must disclose "[a]ny reasonably segregable portion of a record . . . to any person requesting such record after deletion of the portions which are exempt. . . ."  5 U.S.C. § 552(b); see Mead Data, 566 F.2d at 260 (noting that because "[t]he focus of the FOIA is information, not documents, . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material").  An agency may withhold only that information to which the exemption applies, and so must provide all "reasonably segregable" portions of that record to the requester.  Yonemoto, 686 F.3d at 688.  The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed.  Pacific Fisheries Inc. v. United States, 593 F.3d 1143, 1148-1149 (9th Cir. 2008) (reiterating that "[c]ourts must apply that burden with an awareness that the plaintiff, who does not have access to the withheld materials, is at a distinct disadvantage in attempting to controvert the agency's claims").

In the Ninth Circuit, the district court must review the agency's "segregability" decisions on a document-by-document basis.

> It is reversible error for the district court 'to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof,' with respect to that document.  The court . . . must make a specific finding that no information contained in each document or substantial portion of a document withheld is segregable.

Wiener, 943 F.2d at 988 (citation omitted).  Non-exempt portions of a document must be disclosed unless the court finds that they are inextricably intertwined with exempt portions to such a degree that separating the two would "impose significant costs on the agency and produce an edited document with little informational value."  Willamette Indus., Inc. v. United States, 689 F.2d 865, 867-868 (9th Cir. 1982) (citing Mead Data, 566 F.2d at 261).

It is not sufficient for an agency to simply conclude that there is no segregable information without explaining its reasons for such a conclusion.  Mead Data, 566 F.2d at 261.  "[U]nless the segregability provision of FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts."  Id.  An

1   agency must provide a reasonably "detailed justification" and not just "conclusory

2   statements" to prove that it has released all reasonably segregable information.  See id.  In

3   addition to a statement of its reasons, an agency should also describe what proportion of the

4   information in a document is non-exempt and how that material is dispersed throughout the

5   document.  Id. (noting that "[i]f a document itself contains many pages of information, and

6   there are logically divisible sections for which the proportion and distribution description

7   would differ significantly," the agency should describe the document "by section rather

8   than as a whole").

9        Plaintiff contends that Defendants have failed to segregate all non-exempt

10   information.  Pl.'s Mtn. at 32.  Plaintiff argues that "[g]iven the broad brush with which

11   Defendants have painted exempt material, it is almost a certainty that Defendants have

12   withheld more information than is otherwise justifiable."  Id.  Defendants contend, without

13   elaboration, that summary judgment in their favor is appropriate because they have

14   "reviewed the withheld material and have disclosed all non-exempt information that

15   reasonably could be disclosed."  Defs.' Mtn. at 21.  In support of their contention,

16   Defendants direct the Court to their respective *Vaughn* indices and to conclusory averments

17   in the declarations accompanying the indices, which generally state that all reasonably

18   segregable, non-exempt material has been released.  See id., (citing Baines Decl., Exh. A;

19   Fausett Decl. ¶ 8, Exh. A; Hackett Decl. ¶ 23, Exh. J; Hardy Decl. ¶ 101, Exh. H; Hargrave

20   Decl., Exh. A).

21        Having reviewed the Defendants' *Vaughn* submissions, the Court concludes that no

22   Defendant has sustained its burden to show that it has disclosed all reasonably segregable

23   portions of the documents at issue.  None of the Defendants has offered a particularized

24   explanation establishing that all reasonably segregable portions of each challenged

25   document have been segregated and disclosed.  The failure to provide a detailed

26   justification regarding the release of all reasonably segregable material denies Plaintiff the

27   opportunity to challenge, and the Court to assess, the soundness of the withholding of

28   information.  See Church of Scientology of Cal. v. U.S. Dep't of the Army, 611 F.2d 738,

744 (9th Cir. 1979) (noting that district courts are generally required to make explicit findings concerning the segregability of withheld documents).  While the Court recognizes that the process of segregating non-exempt information from exempt information and furnishing the non-exempt information to Plaintiff with a justification for the segregation may be time consuming and expensive, the government nonetheless bears the burden of justifying nondisclosure of any withheld records or segments of records.  See NLRB v. Robbins Tire and Rubber Co., 437 U.S. 214, 224 (1978).

### E.    *In Camera* Inspection

Having concluded that the Defendants' *Vaughn* submissions are largely inadequate to enable the Court to determine whether Defendants have properly withheld information under FOIA, the Court has "several options, including inspecting the documents *in camera*, requesting further affidavits, or allowing the plaintiff discovery."  Spirko v. U.S. Postal Serv., 147 F.3d 992, 997 (D.C. Cir. 1998).  Plaintiff requests the Court conduct an *in camera* inspection of the withheld information or grant summary judgment in its favor and order the immediate release of the information.  However, summary judgment is not warranted given the Court's conclusion that Defendants' *Vaughn* submissions are inadequate, not that information has been improperly withheld.

The Court also declines to conduct an *in camera* inspection of the withheld information.  "District courts have discretion to order *in camera* inspection of the actual documents the government wishes to withhold."  Lion Raisins v. U.S. Dep't of Agric., 354 F.3d 1072, 1079 (9th Cir. 2004).   However, *in camera* review is "not an acceptable substitute for an adequate *Vaughn* index."  Wiener, 943 F.2d at 979; see also Spirko, 147 F.3d at 997 ("a district court should not undertake *in camera* review of withheld documents as a substitute for requiring an agency's explanation of its claimed exemptions in accordance with Vaughn").  *In camera* review does not allow for "effective advocacy," and therefore "may supplement an adequate *Vaughn* index, but may not replace it."  Wiener, 943 F.2d at 979; see Roth v. U.S. Dept. of Justice, 642 F.3d 1161, 1185 (D.C. Cir. 2011) ("Requiring agencies to provide public explanations for their redactions allows for

adversarial testing of the agencies' claims, which helps focus the court's attention on the most important issues in the litigation and may reveal not otherwise apparent flaws in the agencies' reasoning.").

Where, as here, there are hundreds of documents involved, "no trial court can reasonably be expected to wade through a mass of exhibits *in camera*." Church of Scientology, 611 F.2d at 743. The Court has explained the inadequacies of Defendants' *Vaughn* submissions. At this juncture, the Court finds that *in camera* review is not appropriate. Instead, Defendants will be afforded the opportunity to cure the deficiencies described above through the filing of revised *Vaughn* indices and supporting declarations. Should any Defendant decide to submit revised submissions, the Defendant shall provide sufficiently detailed submissions to enable the Court to review the soundness of the claimed exemptions on a document by document basis. The revised submissions must provide specific, detailed explanations for the manner in which the claimed exemptions apply to *each* document or portion thereof so that the Court can fulfill its duty to determine whether an exemption has been properly invoked. The revised *Vaughn* indices and declarations must also include an adequate segregability analysis that provides a detailed justification showing that all reasonably segregable information has been disclosed.

## IV.  CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.      Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. The Defendants' motion is granted to the extent it seeks a determination that the ODNI properly withheld information from Documents 14-19. The Defendants' motion is denied in all other respects. Plaintiff's cross-motion for summary judgment is DENIED.

2.      Defendants shall release the information that the Court has not determined was properly withheld or provide satisfactory supplemental *Vaughn* indices and declarations that address the deficiencies identified above. In the event that any Defendant decides to file supplemental materials, the Defendant shall serve Plaintiff with these

materials by no later than sixty (60) days from the date this Order is filed.  The parties shall meet and confer regarding the supplemental materials in an attempt to narrow the documents at issue.  If the parties are unable to resolve all of their disputes regarding the withheld information, the parties shall submit a stipulation by no later than thirty (30) days after the service of the supplemental materials proposing the timing of further proceedings, including the filing of any further dispositive motions.  To the extent the parties are successful in narrowing the issues in dispute, the parties shall submit a stipulation identifying the documents that are no longer in controversy.

3.      This Order terminates Docket 63 and Docket 76.

IT IS SO ORDERED.

Dated:  9/30/2013

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge